June, 1905.]  American etc. Co. v. Regents etc.  163

Points Decided.

(June 14, 1905.)

## AMERICAN BONDING COMPANY v. REGENTS OF UNIVERSITY.

[81 Pac. 604.]

Bonding Company on Contract—When Assumed Fulfillment of Contract is Liable for Inferior Materials Used by Contractor. Witness Who is a Co. .:ractor and Rr⁻˙ il Dealer May Testify From Prices Procured from a Wholesale Catalogue.

1. A bond provided that if the principal shall fail to comply with all the conditions of the contract to such an extent that the same shall be forfeited, said surety shall have the right and privilege to assume said contract and to sublet or complete same whichever surety may elect to do, provided it is done in accordance with the contract, is, a legal and valid obligation, and the company may elect to complete the contract, stand on the terms of the bond, or voluntarily pay any damages resulting from the principal's default.

2. Whc:e a bon..ing r surety company assumes a defaulted contract, it assumes all defects of the principal's work, together with inferior materials used, and is entitled to the benefits of the contract from the time of the default of the principal, together with any sum that may be due the principal at the time the default is declared.

3. Appellant cannot be heard to complain of an instruction that respondent cannot recover on a counterclaim for stipulated damages at the rate of ten dollars per day for all the time after the work should have been completed under the contract until after the last payment has been made to the contractor when a similar instruction has been given by the court at his request.

4. A witness who has been engaged in the hardware and plumbing business for a period of five years and more may testify as to the difference in cost of materials used in a building and the kind the contract calls for, even though he testifies that he fixes the difference in prices from a catalogue sent out by a wholesale dealer in such articles, especially where he testifies that he has compared catalogue prices of various wholesale dealers and they are all alike in prices.

(Syllabus by the court.)

APPEAL from the District Court of Nez Perce County. Honorable Edgar C. Steele, Judge.

Judgment for the respondent from which, and an order overruling a motion for new trial, plaintiff appeals. Judgment affirmed.

The facts are stated in the opinion.

W. S. Gilbert and Orland ⸱; Smith, for Appellant.

The language of the provision of the bond is, "That said surety shall be notified in writing of any act on the part of the said principal, or his agent or employees, which shall involve a loss for which the said surety is responsible hereunder, immediately after the occurrence of such act shall have come to the knowledge of the duly authorized representative or representatives of the Regents of the University of Idaho." (*National Surety Co. v. Long,* 125 Fed. 887, 60 C. C. A. 623.) The notice provided by the contract upon the default of the contractor is a condition precedent to the right of the respondent to recover upon the bond. (*Guarantee Co. v. Mechanics' Sav. Bank,* 183 U. S. 402, 22 Sup. Ct. Rep. 124, 46 L. ed. 254; *Imperial Fire Ins. Co. v. Coos County,* 151 U. S. 452, 14 Sup. Ct. Rep. 379, 38 L. ed. 233.) The party to a contract of surety which commits the first breach is not entitled to recover of the other party for a subsequent failure on its part to perform. (*Robson v. Bohn,* 27 Minn. 333, 7 N. W. 357; *Pope v. Porter,* 102 N. Y. 366, 7 N. E. 305; *Rice v. Fidelity etc. Co.,* 103 Fed. 427; *Creswell R. & C. Co. v. Martindale,* 63 Fed. 84; *Filley v. Pope,* 115 U. S. 213, 6 Sup. Ct. Rep. 19, 29 L. ed. 372.) The rule is firmly established that, where payments are to be made by installments, if the terms are not strictly complied with, the surety is discharged. The surety has the right to insist that payments be not made prematurely, that no variations be made without the consent of the surety, and if there are any made, the surety will be released. (*Bell v. Paul,* 35 Neb. 240, 52 N. W. 1110; *Bragg v. Shain,* 49 Cal. 135; *Bachus v. Archer,* 109 Mich. 666, 67 N. W. 913; *Kane v. Thuener,* 62 Mo. App 69; *Kissing v. Allspaugh,* 91 Cal. 231, 27 Pac. 655, 13 L. R. A. 418; *Simonson v. Thori,* 36 Minn. 439, 31 N. W.

861.)    It is not sufficient that he may sustain no injury by
a change in the contract, or that it may be for his benefit.
He has the right to stand upon the very terms of his contract;
and if he does not assent to any variation of it, and a varia-
tion is made, it is fatal, and courts of equity, as well as law,
have been in the constant habit of scanning the contracts of
surety with considerable strictness.    (*Tomlinson v. Simpson,*
33 Minn. 422, 23 N. W. 866; *Fidelity & Deposit Co. v.
Robertson,* 136 Ala. 379, 34 South. 933; *Wehrung v. Denham,*
42 Or. 386, 71 Pac. 133; *Cowdry v. Hahn,* 105 Wis. 455,
76 Am. St. Rep. 923, 81 N. W. 882; *Peters v. Mackay,* 20
Wash. 172, 54 Pac. 1122.)    Appellant respectfully submits
that the action of the court in permitting the witness Sherer
to testify from catalogue and discount sheet prices was a
gross infraction of the ruling prohibiting the admission of
hearsay evidence; and the decision of the courts in this con-
nection are so uniform and the rule itself is supported with
so much reason that we believe this court will have no
difficulty in deciding that the action of the trial court
amounted to reversible error.    (*Whelan v. Lynch,* 60 N. Y.
469; *Cook County v. Harms,* 10 Ill. App. 24; *Vogt v. Cope,*
66 Cal. 31, 4 Pac. 915; *Nelson, Morris & Co. v. Columbian
Iron Works etc.,* 76 Md. 354, 25 Atl. 417, 17 L. R. A. 851;
*O'Brien v. Gallagher,* 26 Misc. Rep. 838, 57 N. Y. Supp. 250;
*Norfolk & Western Ry. Co. v. Reeves,* 97 Va. 284, 33 S. E.
606; *Deither v. Ferguson Lumber Co.,* 9 Ind. App. 173, 35
N. E. 843; *Fairley v. Smith,* 87 N. C. 367, 42 Am. Rep. 522.)

Forney & Moore, for Respondent.

Testimony as to the market value of goods from one who
has been engaged in the business of buying and selling such
goods in connection with his business for a number of years
is admissible, even though it appear that he bases his estimates
on price lists, such as market lists furnished to him by deal-
ers, viz., such market lists as dealers are governed by in their
transactions.    (*Sirrine v. Briggs,* 31 Mich. 443; *Cliquot's
Champagne,* 3 Wall. 114, 18 L. ed. 116; *Republican News-*

*paper Co. v. Northwestern Associated Press*, 51 Fed. 377, 2
C. C. A. 282; *Whitney v. Thatcher*, 117 Mass. 523; *Harrison
v. Glover*, 72 N. Y. 451; *Fennerstein's Champagne Case*, 3
Wall. 145, 18 L. ed. 121, and footnotes; *Sisson v. C. & T. R.
R. Co.*, 90 Am. Dec. 252, and notes.)    The Champagne cases
were explained and approved by Field, J., in *Chaffee v.
United States*, 18 Wall. 516, 21 L. ed. 908.

STOCKSLAGER, C. J.—Appellant commenced its action
in the district court of Latah county, and alleged its ex-
istence as a corporation under and by virtue of the laws of
the state of Maryland, and that the defendants, the Regents
of the University of Idaho, is a body corporate, created and
organized under the laws of Idaho.

The fourth allegation is that the defendant university and
defendant Dullanty, on the twenty-seventh day of July, 1901,
made, executed and delivered a certain agreement in writing,
a copy of which is made a part of this complaint, marked
"Exhibit A."

The fifth is that to secure the performance of said agree-
ment on the part of the defendant Dullanty, said Dullanty,
as principal, and plaintiff, as surety, on the twenty-seventh
day of July, 1901, executed and delivered to the Regents of
the University of Idaho a certain bond, a copy of which is an-
nexed to this complaint, marked "Exhibit B," and made a
part hereof.

6. That Dullanty performed all the matters and things re-
quired of him by said contract with the regents of the uni-
versity in accordance with the terms thereof, up to about
February 24, 1902, at which time he threw up said contract
and wholly abandoned the same.

7. That on the twenty-seventh day of February, 1902, de-
fendant, the Regents of the University of Idaho, according
to the terms and conditions of the above-mentioned bond,
notified and requested plaintiff to proceed with said contract
and complete the same; that in compliance with said notice,
and in accordance with the terms of said contract and bond,
the plaintiff immediately assumed said contract and fully
completed the same at its own cost.

8. That under said contract and by direction and with the consent of the defendant, the Regents of the University of Idaho, said Dullanty furnished extras in labor and material not called for in the specifications mentioned in said contract, of the value and agreed price of $805.

9. That under the said contract and by direction and with the consent of the defendant, the Regents of the University of Idaho, plaintiff, after it had assumed said contract, furnished extras in labor and material not called for in the specifications mentioned in said contract, of the value and agreed price of $428.55.

10. That plaintiff expended in completing said contract the sum of $3,087.

11. That defendant, the Regents of the University of Idaho, has paid defendant Dullanty under said contract the sum of $8,135.10.

12. That on or about March 14, 1902, plaintiff agreed with defendant, the Regents of the University of Idaho, that formal acceptance of the work under said contract be waived.

13. That plaintiff completed the work under said contract to the satisfaction of it, A. Ritchie, the architect mentioned in said contract, and the Regents of the University of Idaho, and that on or about the 12th of June, 1902, said architect and the Regents of the University of Idaho, accepted the work under said contract.

14. That on or about the twelfth day of June, 1902, defendant, the Regents of the University of Idaho, promised to pay plaintiff whatever balance was due on account of said contract.

15. That on the twelfth day of June, 1902, plaintiff demanded of defendant, the Regents of the University of Idaho, payment of the balance due under the contract, to wit, $1,358.45, which demand said defendant refused and still refuses to comply with.

16. That the defendant, the Regents of the University of Idaho, have wholly failed and refused to make any final settlement with the plaintiff under said contract and bond, and that there is now due and owing from said defendant to plain-

tiff the sum of $1,358.45, with interest at the legal rate from June 12, 1902, to date.

That the defendant Dullanty claims that there is still due him from the Regents of the University of Idaho certain money under said contract.

The obligations of "Exhibit A" above referred to and important for a determination of the questions before us are as follows: "Witnesseth, the said contractor does hereby covenant, promise and agree to and with the said Regents in the manner following, that is to say: the said contractor shall and will, for the consideration hereinafter named, on or before the 1st day of October, A. D. 1901, well and sufficiently erect and finish the plumbing work and the steam-heating plant of the Girls' Dormitory Building, and shall and will on or before the first day of November, A. D. 1901, well and sufficiently erect and finish the plumbing work and the steam-heating and power plant of the Science Hall or School of Mines Building, both of said buildings being now in the course of construction upon the university grounds in the city of Moscow, Idaho; said plumbing work to be done according to the drawings and specifications for said work as prepared by W. A. Ritchie, architect, and signed by the parties hereto; and said steam-heating and power plant to be done according to the drawings and specifications for said work as prepared by W. A. Ritchie, architect, and according to the detail drawings and specifications submitted by the said contractor with his bid, all signed by the parties hereunto; all of said work to be done in a good, workmanlike and substantial manner to the satisfaction of the architect and regents, and said contractor shall procure, provide and supply such good, proper and sufficient materials and labor of all kinds whatsoever, and all scaffolding, implements, tools and cartage necessary for the completion and finishing of said plumbing work and steam-heating and power in said building in a substantial and satisfactory manner in accordance with said plans, specifications and detail drawings for the sum of eight thousand two hundred and sixty ($8,260) dollars.

"And said regents do hereby, for themselves and their successors in office, as such regents, and for and on behalf of the Regents of the University of Idaho, and for and on behalf of the state of Idaho, covenant, promise and agree to and with the said contractor, his executors, administrators and assigns, that they, the Regents of the University of Idaho, shall and will, in consideration of the covenants and agreements being strictly performed by said contractor as specified herein, pay or cause to be paid unto the said contractor the sum of eight thousand two hundred and sixty ($8,260) dollars in the following manner, to wit: Payments to be made semi-monthly upon estimates to be prepared by the architect, covering the value of all materials provided and delivered on the university grounds, and the value of all labor employed upon the works during the two weeks preceding, less ten per cent (10%) of the total value of the materials and labor provided, which said ten per cent (10%) shall be retained until the completion of said plumbing work and steam-heating and power plants in said buildings, and the final acceptance of the same by the architect and the regents, provided that each of said partial payments shall be made only upon certificates being first presented, signed by the said W. A. Ritchie, architect, to the effect that the material and labor upon which said payments are to become due, respectively, have been procured, provided, supplied and performed in accordance with the drawings and specifications, and in compliance with the provisions of the contract. And it is hereby further agreed by and between the parties hereunto:

"First. The specifications and drawings are intended to cooperate so that any material or work called for in the specifications and not shown or indicated on the drawings, or *vice versa*, are to be procured, provided, supplied and performed the same as if it were particularly set forth, mentioned, indicated or shown in both the drawings and specifications, to be true meaning and intent of said drawings and specifications.

"Second. The contractor, at his proper cost and expense, is to procure, provide and supply all manner of materials, labor,

scaffolding, implements, tools, cartage, etc., of every description necessary or requisite for the performance and completion of this contract.

"Third. Should the said regents at any time during the progress of the work in said buildings require any alterations, deviations, additions, omissions from the drawings, specifications of this contract, they shall be at liberty to have such changes made and the same shall in no way or manner affect or avoid this contract, but the additional cost, if any, of such changes will be added to the contract price of this work and deduction shall be made from said contract price for all omissions of work specified, at a fair and reasonable valuation. No bill will be allowed or claim paid for extra materials or labor used in alterations, deviations or additions to the work, unless such alterations, deviations or additions have first been recommended by the architect and approved by the regents and the price thereof agreed upon in writing before said alterations or deviations or added work is performed.

"Fourth. Should any dispute arise respecting the true value of any extra work or omitted work, the same shall be valued by two competent persons, one employed by the said regents and the other by the said contractor, who in case they cannot agree as to the value of such work or omitted work, shall name an umpire whose decision shall be final and binding upon all the parties to this contract.

"Fifth. Should the said contractor at any time during the progress of said work refuse or neglect to procure, provide or supply a sufficiency of suitable materials or workmen, the regents shall, upon the advice of the architect, have the power to procure, provide or supply the requisite materials or workmen after three days' notice to said contractor to finish the work on said buildings and all expense so incurred by the said regents shall be deducted from the amount remaining due to the said contractor under this contract at the time of said default.

"Sixth. The said contractor shall, within twenty-four hours after receiving written notice to that effect from the architect and regents, proceed to remove from the buildings or from the

grounds all condemned materials, whether worked or unworked, and shall take down such portions of all work as may be condemned by the said architect and regents as being unsound or improper or in any way failing to conform to the drawings and specifications and the conditions of the contract.

"Seventh. Should any dispute arise respecting the true construction or meaning of the drawings or specifications, the same shall be referred to the architect, whose decision thereon and upon all matters pertaining thereto shall be final and conclusive; and should it appear that the work hereby intended to be done or any matters relative thereto are not sufficiently detailed or explained in the said drawings or specifications, the architect will prepare such additional detail drawings or furnish such explanation as may be necessary, and the said contractor shall construct such portion of the work in accordance with such additional detail drawings or such explanations as a part of this contract so far as they may be consistent with the original drawings and specifications.

"Eighth. The said contractor shall cover and protect all portions of the plastering, carpentry work and materials in the building and protect the same from damage by reason of carelessness of his employees in and about the building at all times during the construction of this work, and any such damage shall be repaired and made good by the said contractor at his own cost. The regents shall not in any manner be answerable or accountable for any injury to any person or persons employed on this work in or about the said buildings, or for any loss or damage that shall or may happen to the said work or to said buildi..gs, or in any part or parts thereof respectively, or for any materials or things used and employed in or about the construction or finishing of the same at any time during the progress of this work in said buildings.

"Ninth. Said contractors shall permit the architect and regents and any persons appointed by the architect and regents, to visit and inspect the said work, or any part thereof at all times during the progress of the same, and shall provide sufficient, safe and proper facilities for such inspection.

"Tenth. The said contractor shall and will proceed with the work and every part thereof in a prompt and diligent manner, and shall not hinder or delay the work of any and all co-operating contractors or subcontractors in or about said building, and shall and will fully complete and finish the said work in accordance with said drawings and specifications and the terms of this contract on or before the dates hereinbefore mentioned for the completion of the work in each of said buildings respectively; if the said work shall not be completed in each of said buildings within the time hereinbefore mentioned, then the said contractor shall pay to the said regents for each day's delay after the date for the completion of the said work in each of said buildings, respectively, above fixed, the sum of ten ($10) dollars, as liquidated damages, provided, however, that should any portion of said delay have been caused by reason of fire or by changes or alterations in the said plans, specifications and buildings or by labor strikes or by reason of the acts of any co-operating contractor or subcontractor or by any action of the said regents, and should the architect certify that an allowance of additional time should be made on account of said delay, then, and in that event, said contractor shall be released from the payment of the stipulated damages for the time so certified by the architect and no more.

"Eleventh. And it is mutually agreed by and between the parties hereunto that the said contractor shall construct, finish and complete the steam-pipe mains and returns between the said buildings in accordance with the plans and specifications for the agreed price of one and five one-hundredths ($1.05) dollars per lineal foot, and that upon the completion of this portion of said work the architect shall measure this steam main and returns and shall issue a certificate for the amount due said contractor for said work at the agreed price.

"Twelfth. This contract shall be of force and effect only after the said contractor shall have executed and delivered a good and sufficient bond for the faithful performance of his contract and for the payment of all materials and labor entering into the construction of said work, which bond shall be in

the amount of five thousand ($5,000) dollars, with some acceptable surety company as surety to said bond.

"In witness whereof, the said Regents of the University of Idaho, by resolution of the board of regents, have caused these presents to be subscribed by the president and secretary, and its corporate name and seal to be affixed hereunto, and the said contractor has hereunto set his hand and seal this twenty-seventh day of July, A. D. 1901.

"THE REGENTS OF THE UNIVERSITY OF IDAHO,
"By JNO. B. GOODE,
"President.
"GEORGE C. PARKINSON,
"Secretary.
"P. J. DULLANTY."

The bond referred to as "Exhibit B" is of the character in common use by companies of the character of the plaintiff.

The conditions of the bond above referred to are as follows: "That if the said principal shall well, truly and faithfully comply with all the terms, covenants and conditions of said contract on his part to be kept and performed according to its tenor, then this obligation is to be null and void; otherwise to be and remain in full force and virtue in law.

"This bond is issued subject to the following provisions: 'Provided, that said surety shall be notified in writing of any act on the part of the said principal, or his agent or employees, which shall involve a loss for which the said surety is responsible hereunder, immediately after the occurrence of such act shall have come to the knowledge of the duly authorized representative or representatives of the Regents of the University of Idaho, a body corporate, who shall have the supervision of the completion of said contract, and a registered letter mailed to the president of said surety, at its principal office in Baltimore City, Maryland, shall be deemed sufficient notice within the meaning of this bond.

"'Provided further, that if the said principal shall fail to comply with all the conditions of said contract to such an extent that the same shall be forfeited, then said surety shall

have the right and privilege to assume said contract and to sublet or complete same, whichever said surety may elect to do, provided it is done in accordance with said contract.

" 'Provided further, that in the event of any breach of the conditions of the bond, said surety shall be subrogated to all the rights and properties of said principal arising out of said contract, and all deferred payments and any and all moneys and properties at that time due and payable or that may thereafter become due and payable to the said principal, under and by virtue of said contract shall be credited upon any claim the said Regents of the University of Idaho, a body corporate, may make upon said surety because of said breach.

" 'Provided further, that any suits at law or proceedings in equity brought against this bond, to recover any claim hereunder, must be instituted within six months after the first breach of said contract.

" 'And provided further, that said surety shall not be liable for a greater sum than five thousand ($5,000) dollars because of, or on account of, this bond.

" 'And provided lastly, that the assured or the superintendent of the work must give the said surety due notice before the last payment under the contract herein referred to is made to the principal, otherwise this obligation shall be void as to any liability of the surety hereunder.' "

The defendant in its answer, for the want of knowledge and information, denies allegations 1 and 2 of the complaint and admits paragraphs 3 and 4. Admits that, as alleged in paragraph 5, on the twenty-seventh day of July, 1901, defendant Dullanty, as principal, and plaintiff as surety, executed to defendant University of Idaho a certain bond, of which "Exhibit B" is a substantial copy, but denies the balance of information or knowledge. Denies allegation 6. Admits allegation 7, wherein it is stated that the defendant University of Idaho notified and requested the American Bonding and Trust Company of Baltimore City, the above-named surety of the defendant, P. J. Dullanty, to proceed with said contract and complete the same, but denies that it ever notified or requested the plaintiff to proceed with said contract or complete the

same, and denies that said plaintiff or anyone else, ever completed the said contract at his own cost or otherwise.

Denies all of paragraphs 8 and 9 and all the allegations of the complaint, and by way of a separate defense and counterclaim says: 1. That defendant University of Idaho is a body corporate and that until about April, 1902, the American Bonding and Trust Company of Baltimore City was a corporation; 2. Avers the contract between defendant university and Dullanty; 3. The execution and delivery of the bond set out in the complaint as plaintiff's "Exhibit B"; 4. That immediately thereafter Dullanty entered upon the performance of the contract and furnished a part or portion of the materials required before the performance of the same and caused to be performed a part of the work and labor required by the terms thereof.

The fifth avers that said Dullanty did not perform the conditions of said contract by completing the steam-heating plants of the Girls' Dormitory Building on or before October 1, 1901, and did not erect and finish the plumbing work and the steam-heating plants of the Science Hall or School of Mines Building on or before the first day of November, 1901, and that on or about the thirteenth day of January, 1902, he forfeited said contract, and the said surety, the American Bonding and Trust Company, did assume said contract and undertook to perform all the terms and conditions to be kept and performed by said Dullanty.

6. Avers that from the first day of October, 1901, to said thirteenth day of January, 1902, said Dullanty had become indebted to this defendant in the sum of $1,050, under the terms of said contract, for delay or failing to perform and complete the work required to be done by the terms of the contract on the building designated as the Girls' Dormitory, and in the further sum of $740 for delay in failing to perform and complete the work in the Science Hall or School of Mines Building, no part of which has been paid.

7. That up to January 13, 1902, this defendant had paid to Dullanty $6,930, in compliance with the terms and conditions of said contract, and upon estimates made by W. A. Ritchie upon materials furnished and labor performed by

Dullanty, and had promised and agreed to pay Crane Company of Portland, Oregon, the sum of $1,160 for goods and material sold to the said Dullanty to be used by said Dullanty in performing the conditions of said contract, which said Crane Company delivered to Dullanty upon the promise of this defendant to pay said sum of $1,160.

8. Avers that on January 13, 1902, Dullanty having failed to comply with all the conditions of the contract, the plaintiff acting under an option reserved in said bond, did assume said contract and undertake to perform the requirements of said contract.

9. Avers that said bonding company failed for a period of fifty-seven days after the thirteenth day of January, 1902, to perform said contract, so that said buildings, or either of them, could be occupied, and thereby became indebted to this defendant in the sum of $1,140 for delay in erecting and finishing the plumbing work and the steam-heating of the said Girls' Dormitory and said Science Hall or School of Mines Building as provided for in said contract.

10. That said American Bonding and Trust Company failed to furnish the materials and perform the work and requirements called for by said contract in this, to wit: That the soil pipe mains do not exceed four inches inside diameter and the principal branches do not exceed four inches inside diameter. That no caps of any kind were or are provided on the ventilator stacks; that the lead pipes under the various fixtures provided and placed under said contract were not rubbed bright and varnished; that no hose or hoserack was provided for the third floor of the Science Hall or School of Mines Building; that the two water-closet in lavatory on the basement floor of the dormitory were not put in; that the fifty feet of one and one-half inch rubber-lined cotton hose for one swinging hoserack was not provided in the Girls' Dormitory; that no "T" handle brass stopcocks were placed in the supply pipes of the washbowls in the bathrooms of the dormitory; that no "T" handle brass stopcock with side outlet drain was placed in the main supply for hot and cold water in each toilet-room, nor was any waste pipe placed to

connect therewith for the purpose of draining out pipes of that room in case of breaks or leaks; that no safe pans of any kind were placed in the water-closets and wash basins on the first and second floors of said building, nor was there any safe waste mains to be carried to the outside of the building with separate drain pipe outlet to the sewer. All corner slabs for single wash basins are only eight (8) inches, nor was there any bronze iron brackets placed under each marble wash-stand, nor was the kitchen provided with a slop sink with brass flushing rim on combination trap stand, nor were hose bib faucets and siphon cistern on iron brackets with nickle-plated chain and pull provided. Urinal stalls are only two feet wide and five feet and six inches high. The back ends and partition slabs are only seven-eighths inch thick. The floor slab is only one and one-half inch thick. The floor slab has no gutter and is not grooved and has no outlet in the slab; is not fitted with strainer or connection to waste safe branch and main, nor was any automatic flushing tank placed above the urinal stalls as provided for in said contract. Under the head of engine and connection, the specifications referred to in said contract provide as follows:

"The three-inch high pressure steam supply pipe from high pressure header is included in these specifications. If this engine referred to is in place and ready for connection thereto, the same are to be made by this contractor. In live steam connection from high pressure main, place a three-inch Austin grease eliminator and three-inch gate valve. In the exhaust connection from engine place plugged 'T' for connection for plumber's tank; also a five-inch Austin grease eliminator near low pressure connection. From engine run a five (5) inch exhaust pipe through roof and to a point six feet above roof. Provide this exhaust pipe with a five (5) inch Davis noise-less back pressure valve. The top of this exhaust head to be provided with a five (5) inch Lyman patent galvanized exhaust head. From this exhaust head run a one (1) inch relief to trap in boiler room," no part or portion of which

fixtures was placed, supplied or provided by the said American Bonding and Trust Company of Baltimore City.

Specifications further provide: "Furnish and place in boiler-room, where shown on plans, one (1) Worthington, Deen or Snow automatic feed pump and receiver, size $5\frac{1}{4}$x $3\frac{1}{2}$x5 and brass fitted. This pump and receiver to be used only when heating system is in operation. To be provided with a Detroit Light Feed Lubricator.

### "FOUNDATION.

"The foundation for the pump and receiver and the supply tank to be set on a suitable solid brick cr stone foundation with a stone cap 6 inches thick." In lieu of which the said American Bonding and Trust Company of Baltimore City placed a cheap wooden tank for receiver and an inferior pump, set on wooden plank for a foundation. Said specifications further provide:

"Furnace and sink to level of boiler-room floor. One cast-iron blow-off catch basin twenty-four inches in diameter and thirty-six inches deep provided with three (3) inch outlet and removable cover. This basin to receive blow-off from boilers, tank and trap. From catch basin run a one and one-half inch vapor pipe to a point above roof," no part of which was supplied or provided. Nor were any galvanized sleeves provided where pipes passed through the floors of said buildings and two eighty-foot radiators, provided for in said contract to be placed in the third story of said building known as the Science Hall of School of Mines, were not placed or erected therein and other various and divers omissions not herein mentioned, to defendant's damage in the sum of two thousand dollars.

11. That the plumbing work and steam-heating and power plants in said buildings furnished and provided by the American Bonding and Trust Company of Baltimore City, in completing said contract after it had assumed the same, are greatly inferior to, and of less value, than the plumbing work and steam-heating and power plants provided for said buildings by the terms of said contract, and that the difference in

value between the said plumbing work and steam heating and power plants furnished and placed in said building by the said American Bonding and Trust Company and the plumbing work and steam-heating and power plants for said buildings provided for in said contract is the sum of two thousand ($2,000) dollars; that neither the said W. A. Ritchie, the architect mentioned in said contract, nor this defendant, has accepted said plumbing work or steam-heating or power plants in said building, or either of them, or any part or portion thereof.

12. That some time prior to the said thirteenth day of January, 1902, when the said American Bonding and Trust Company of Baltimore City assumed the said contract by the said P. J. Dullanty forfeited as above set forth, the said P. J. Dullanty had purchased from Crane Company of Portland, Oregon, certain goods and materials to the amount of eleven hundred and sixty dollars ($1160), to be used by him, the said P. J. Dullanty, in erecting and finishing the plumbing work and steam-heating plant of the Girls' Dormitory Building, and the plumbing work and steam-heating and power plant of the Science Hall or School of Mines Building, mentioned in said contract.

13. That prior to the delivery of said goods and materials by Crane Company to the said P. J. Dullanty on about December ——, 1901, this defendant, at the request of said P. J. Dullanty, promised and agreed to pay to the said Crane Company for said goods, f. o. b. cars, Moscow, the sum of eleven hundred and sixty ($1160) dollars, and in consideration of said promise so made by this defendant, the said Crane Company did deliver said goods and materials to the said P. J. Dullanty.

14. That on the said thirteenth day of January, A. D. 1902, when the said American Bonding and Trust Company of Baltimore City assumed said contract as above set forth, it promised and agreed to and with this defendant that if the said W. A. Ritchie would issue a certificate of estimate in the sum of twelve hundred and five and ten one hundredths ($1205.10) dollars, upon the material theretofore furnished

and the work theretofore performed by the said P. J. Dullanty, under said contract; that it, the said American Bonding and Trust Company of Baltimore City, out of the proceeds received from such estimate, would pay to the said Crane Company the said sum of eleven hundred and sixty ($1,160) dollars, which this defendant had promised and agreed to pay and to save this defendant harmless therefrom.

15. That in consideration of said promise made by the said American Bonding and Trust Company of Baltimore, and its further promise to immediately proceed to sufficiently erect and furnish the plumbing work and the steam-heating plant of the Girls' Dormitory Building and the steam-heating and power plant and the plumbing work of the Science Hall or School of Mines Building, mentioned in said contract, this defendant consented that the said W. A. Ritchie, architect aforesaid, issue such certificate of estimate, and that the same was delivered to the American Bonding and Trust Company of Baltimore City.

16. That the said American Bonding and Trust Company of Baltimore City received upon said certificate the sum of twelve hundred and five and ten one-hundredths ($1,205.10) dollars, but failed to pay to the said Crane Company of Portland, Oregon, the said sum of eleven hundred and sixty ($1,-160) dollars, or any part or portion thereof, and converted the said sum of eleven hundred and sixty ($1,160) dollars so paid to it by this defendant to its own use and benefit, to plaintiff's damage in the sum of eleven hundred and sixty ($1,160) dollars, with interest thereon from the said thirteenth day of January, A. D. 1902, at the rate of seven per cent per annum.

17. That upon an examination of the plaintiff's complaint herein filed and verified by W. S. Gilbert, attorney for plaintiff, this defendant is informed and believes, and upon such information alleges the truth to be, that the plaintiff herein, "American Bonding Company of Baltimore," a corporation, has succeeded to all the property and rights, and is liable for all the debts, defaults and obligations of the said American

Bonding and Trust Company of Baltimore City, the surety above mentioned.

Upon these pleadings this case was submitted to a jury, and on the eighth day of January, 1904, a judgment was entered in favor of the defendant on his counterclaim in the sum of eighteen hundred and forty-four and twenty-three one-hundredths ($1,844.23) dollars, being the amount found by the jury. The appeal is from the judgment and the order of the court overruling plaintiff's motion for a new trial.

We find thirty-two errors assigned in the record, largely based upon the ruling of the trial court in the admission and rejection of evidence, the giving and refusal to give instructions. There is no dispute as to the execution and delivery of the contract, its terms and conditions; neither is there any controversy over the execution and delivery of the bond with its obligations. It is also an undisputed fact that appellant undertook to perform the terms and conditions of the contract after it was informed that Dullanty had defaulted in his obligations as shown by such contract with the Regents of the University of Idaho.

The important questions, and the controlling ones, are as to the responsibility of the appellant after it assumed the contract of Dullanty, and the sufficiency and competency of the evidence of the respondent university to support its counterclaim. It is argued by counsel for respondent that: "When appellant was informed of the default of Dullanty to comply with the conditions of the contract, it had the privilege of standing upon the terms of its bond; it could voluntarily pay any damages resulting from Dullanty's defaults, or it could voluntarily assume Dullanty's contract and undertake to perform and complete the same." We think this is a correct statement of the law; hence the relations between the appellant and the university are the same as if Dullanty were suing the Regents of the University of Idaho for a balance due on his contract, and the latter were attempting to counterclaim against his cause of action.

Counsel for appellant say: "The board of regents were themselves first in fault, and did not comply with the provi-

sions of the bond under which appellant was bound, in that
the respondent did not give the appellant notice of the occur-
rence of acts which might, and did, occasion loss to the ap-
pellant at such time, nor in the manner provided by the
bond." It seems to be conceded that appellant was not no-
tified of the default of Dullanty in the fulfillment of his con-
tract until about the twenty-eighth day of December, 1901.
This being true, respondent could not counterclaim against
appellant the liquidated damages provided for in the contract
of Dullanty with respondent university. When appellant
was notified that Dullanty had defaulted, and it assumed to
carry out the terms of the contract, it immediately became
liable to respondent, the university, for all inferior work done
by Dullanty, also the difference in value between the articles
used by Dullanty and the articles called for by the contract—
if articles differing from or inferior were used—and any dam-
age that may have been caused by the use of inferior articles.

Learned counsel for appellant insist that respondent having
failed for a period of about two months to notify it of the
failure of Dullanty, no liability exists against appellant for
any damages which may have been sustained by respondent by
reason of Dullanty having failed to comply with the terms of
his contract. We cannot agree with this contention. It is
shown that appellant, after it had the notice, assumed the
contract, and was paid the sum of $1,205.10, then due Dul-
lanty on the contract. When appellant accepted the $1,205.10
and took charge of the work under the contract, it thereby
agreed to make good any defects in work or materials, both
before and after it assumed the contract. It cannot assume
the unfinished contract that it had agreed by the terms of its
obligations to have performed, received the benefits, if any,
from the contract, and escape the liabilities under the terms
of the contract between Dullanty and respondent university.
The authorities cited by appellant in support of its contention
in this particular are not applicable to the facts as shown
by the record in this case.

If it is disclosed by the record that in determining the re-
spective rights of appellant and respondent, the University

of Idaho,. the jury took into consideration and allowed respondent any sum on its counterclaim as damages for the time between the date the work should have been completed by Dullanty and the time when appellant assumed the contract, it was error, and a new trial should be granted. It will be observed that the respondent university, in their offset by their counterclaim, aver that by the use of inferior materials used in the construction of the contract work it has been damaged in the sum of $2,000. Another claim is that the respondent agreed to pay to Crane Company at the request of Dullanty, the sum of $1160 for materials used in the contract work, and in consideration of such promise by respondent, Crane Company, delivered said goods and materials to such Dullanty. In addition to these two claims is the one for $1,205.10 heretofore referred to, making a total of $4,365. All these issues and questions were before the jury, and the verdict is for only the sum of $1,844.23. We have no way of ascertaining how the jury arrived at the conclusion that respondent under the pleadings and proofs should recover this amount over and above the amount of appellant's claim, unless it is disclosed by the instructions of the court, and even then it may have arrived at its conclusion by offsetting appellant's claim with either, or portions, or all the three items enumerated above.

It is next urged that the court erred in its ruling and instructions to the jury that notice to Kleber, the vice-president of the plaintiff, of any failure on the part of the contractor to comply with the contract, was sufficient notice to the appellant. It is unimportant what the court may have instructed on this question, as the appellant waived notice of any kind by assuming the contract and attempting to enforce payment under the Dullanty contract in this suit. It does not base its right of recovery on any theory other than the assumption and fulfillment of such contract. It is said that the ''instructions are indefinite, ambiguous, uncertain, conflicting, and tend to confuse the jury.'' After carefully reviewing the instructions, we are of the opinion that the jury was not

confused or misled by them. They are full and complete and cover every issue raised by the pleadings.

It is insisted by learned counsel for appellant that respondent having failed to comply with its part of the contract by giving notice of the default of Dullanty, it cannot recover on its counterclaim for the time said work was ''uncompleted'' after October 1st and November 1st, respectively, at the rate of $10 per day on each building.

It is shown that the court, at the request of appellant, gave the following instructions: ''Gentlemen of the jury: I charge you that if you find from the evidence that the regents made payments upon the contract after the time specified for the completion of the work, such payments amounted to a waiver of all claims for damages on account of delay in finishing the work up to the time of the last payment—except as against any unpaid balance as I have explained''; the exception is the language of the court. It is stated by appellants that ''the first payment was made to Dullanty after the Girls' Dormitory should have been finished; two other payments were made in October, and on November 25, 1901, $3,600 was paid, being long after the time when the entire contract should have been completed, and from the 1st to the 5th of January, 1902, the further sum of $1,205.10 was paid.''

It is next stated that on the twenty-eighth day of September, 1901, the first attempt was made by the respondent to notify the appellant of any default on the part of the contractor Dullanty in the completion of his contract, such as was required by the bond.

It will be seen from the foregoing statements, which are not disputed by respondent, the university, that if the jury followed the instruction of the court requested by appellant—and we have no reason to believe it did not—it could not have made a difference of a sum in excess of $20 in favor of respondents, as the difference in the time between the last payment and the time of notice was only one month and three days.

The next contention of appellant is that the regents disregarded the provision of the contract with Dullanty whereby

they were to retain ten per cent, and further, did not make the payments in accordance with the provisions of the contract. It is shown that the contract price for the work to be done by Dullanty was $8,260. The total payments to Dullanty by respondents was $6,930. At folio 167 we find the following evidence of Mr. Ritchie with reference to payments to Dullanty: ''October 7th I issued an estimate of $1,600, less ten per cent, making a payment of $1,440 on account of the contract, which was passed and paid to Dullanty on his contract; on October 31st an estimate of $500 was issued, less ten per cent, making a payment of $450 on the contract. On November 25, 1901, an estimate of $4,000, less ten per cent, making a payment of $3,600 on the contract. That was the last estimate that was issued and paid to Mr. Dullanty direct.'' The witness further says that another estimate was drawn up by his man, Mr. Church, about the 1st or 5th of January, under his direction, for a cash payment of $1,200, and that the amount was paid to Mr. Kleber. This last payment was made to the representative of appellant after it had assumed the contract of Dullanty, and it cannot be heard to complain if the regents paid its representative money theretofore earned by Dullanty, or if not earned by Dullanty, then it was advanced to Kleber to go on with the work of completing the contract. In any event, the regents retained more than ten per cent of the contract price according to the record, and for some reason paid the representative of appellant $1,200 cash a very few days after it assumed the contract. The authorities cited by appellant in support of its contention that a surety has the right to stand upon the exact terms of his contract, and in the manner specified in the obligation, would be applicable were this a suit of the regents on behalf of the university against appellant on the bond for the default of Dullanty on his contract, but when appellant was notified of such default, it elected to complete the contract, thereby assuming all responsibilities, and was entitled to all the benefits of the contract.

This brings us to a consideration of the most important question presented by the record. It is shown that one J. W.

Sterer was a witness on behalf of the respondent university, and testified that he had resided in Moscow the past five years; engaged in the hardware business; engaged in plumbing and handling pipe, more or less, the last fifteen years; "done considerable plumbing last year. I furnish and supply plumbing fixtures and the materials and appliances necessary for the plumbing of urinal stalls, closets and bathrooms." The following question was asked the witness: "Have you recently made an estimate of the value of certain high and low pressure steam fixtures? A. Yes, sir; we can get prices out of the catalogues at any time. Q. Can you tell us what a No. 2 Mason steam trap is worth in Moscow? Court: Answer that yes or no, whether you are acquainted with the value of such a trap. A. No, not without figuring it out from catalogue prices and discounts. Q. Are you prepared to furnish a Mason steam trap here in Moscow? A. Yes, sir. Objected to as incompetent, irrelevant and immaterial. Q. What is a Mason steam trap No. 3 worth delivered here in Moscow? Mr. Gilbert: We object on the ground that it is incompetent, irrelevant and immaterial, particularly that it is incompetent on the ground that the witness himself in his testimony has shown that he is incompetent to testify as to the value of these things in response to Mr. Moore's question. He has said that the only way he can ascertain the value of these articles—and I presume this specific article mentioned is one of those—is by referring to some catalogue and the discount list. If that is so, surely this evidence is of the most hearsay character. The Court: I think that is the way they get values when they buy goods. Mr. Gilbert: Surely, this court is not going to let this jury ascertain the value through catalogues. We haven't the opportunity to cross-examine the man who made up that catalogue. The Court: If he knows what the value is, he may state it; if he does not, he won't state it. Are you acquainted with the value of one of those articles here? A. I can take the value out of the list we have and figure the freight is the only way. The Court: Do you know what the value of one of those machines is here in Moscow by figuring, or have you got it? Do

you know the value?   A.   I can tell what it would cost laid down in Moscow, yes; and we figure a certain per cent.   We put it to the trade taking a job at a certain figure.   Mr. Moore: That is what we want, is the value in the market. A.   That will be the value in the market.   Mr. Gilbert: We object on the ground that it doesn't show the damage, if the Court please, occasioned by the omission of some specific fixtures upon the plumbing job to show what the cost or value is at the present time.   The only competent, relative or material testimony would be to show the value at the time this contract is being performed.   The Court: That is correct; you will show what the value was at that time.   Q.   Tell us, a No. 3 steam trap, tell us what it is worth here.   Same objection.   Overruled.   A.   I would have to figure it out of the catalogues.   Q.   We will go on.   What is eighty-five feet, one inch black iron pipe worth?   Mr. Gilbert: Objected to; the question should limit the witness to the particular time this contract was being performed.   The Court: About that time; any time in the latter part of 1901, or the early part of 1902.   He knows whether there has been any particular difference in the price.   A.   Perhaps it would cost a little less now than then.   Mr. Moore: Then we will ask what it is now.   Mr. Gilbert: I take an exception.   Q.   What are you reading from there?   A.   From my figures from the catalogues and the late prices.   Q.   Have you a catalogue there in your hand?   A.   No.   Q.   What is that you are figuring from, reading from?   A.   ·Something I figured out from our price list the other night.   Q.   Your own figuring, is it?   A.   Yes, sir.   Q.   What would the eighty-five feet of one inch black iron pipe cost?   Mr. Gilbert: I object to that on the ground that it doesn't limit the witness to the proper time.   It was the value at the time the contract was being performed.   The Court: They can carry it back; show it at that time, and whether there has been any difference in the price.   I think these questions should be limited to the time the contract is being performed.   These questions of value ought to be given without any trouble.   Mr. Gilbert: I want to object.   The Court: Object again, then; let's get

it right.   Mr. Gilbert: I object on the ground it is incompetent, irrelevant and immaterial; it doesn't limit the witness to the time when this contract was being performed.   The court has already ruled on that; they may carry it back to that time, and they say they will do it. . . . . Mr. Gilbert: I want to say to the court I am not going to keep this interruption up, but I want the objection fairly before the court, and, to go to all this line of questions, and to object to the answers of the witness on the further ground that he has said he is testifying from a list of catalogued prices.''

This is sufficient to show the qualification of the witness to answer the questions propounded to him in support of the counterclaim of respondent university.

It is urged by counsel for the appellant that the admission of the evidence of this witness over their objection was reversible error: 1. That the value of the various articles as testified to was not at the time the contract was being performed, namely, between July 27, 1901, and April 1, 1902, but during July, 1903.   And also that the witness testified that he based his estimates of the value of these articles solely upon the catalogue and discount sheet prices of a certain plumbing and supply house.

Our attention is called to *Whelan v. Lynch,* 60 N. Y. 469. The facts in this case as stated by the court are as follows: ''The evidence tends to show that, on the 24th of October, 1864, plaintiff had in the hands of said firm twenty-one bales of wool; on that day he sent them an order to sell forthwith. Defendants did not obey the order, and plaintiff abandoned the wool.   The court charged the jury that if instructions were given, as claimed by plaintiff, and defendant's firm neglected to sell within a reasonable time, plaintiff was entitled to recover the highest price between October 24, 1864, and the time of the trial (to wit, January 8, 1872).   Upon the trial plaintiff offered, and the court received, in evidence, under objection, for the purpose of proving market value, the files of a newspaper styled the 'Shipping and Commercial Lists Price Current,' which purported to give the prices of different grades of wool.''

"After holding that the plaintiff could only recover for the value of the wool at or about the time he ordered it sold, on the sound, reasonable, as well as just, theory, that had the defendants complied with his order to sell he could only recover what the wool was worth in the market at that time." As to the newspaper report, the court says: "Independent of the charge, the court was also in error, I think, in admitting the shipping and price current list as evidence of the value of the wool without some proof showing how or in what manner it was made up, where the information it contained was obtained, or whether the quotations of prices made were derived from actual sales, or otherwise. It is not plain how a newspaper, containing the price current of merchandise, of itself, and aside from any explanation as to the authority from which it was obtained, can be made legitimate evidence of the facts stated. The accuracy and correctness of such publication depend entirely upon the sources from which the information is derived. Mere quotations from other newspapers, or information obtained from those who have not the means of procuring it, would be entitled to but little, if any, weight."

There is a very wide distinction between the facts in this case and the one at bar. There was no evidence of any character tending to show the source from which the publication in question obtained its information, whilst in the case under consideration it was shown a catalogue of the wholesale dealer was in possession of the witness, who explained fully to the court and jury how he was enabled from that catalogue to figure on contract work, and that as prices changed from lower to higher, or *vice versa,* he was promptly notified of such changes. It might not be amiss to say here that it is a well-known fact to the business world that practically all goods sold to the retail market is from the system of catalogues. The traveling salesman carries his catalogue prepared by the wholesale dealers and makes his sales to the retail dealer from it. If any changes in prices occur, the salesman is notified in the same manner that the retail dealer is notified, who is in possession of a catalogue.

The next case to which our attention is called is *County. of Cook v. Harris*, 10 Ill. App. 24. After reversing the case for other errors, not important here, the court says: ''The court also permitted the appellee to introduce in evidence upon the question of the value of materials furnished certain price lists of dealers in such articles; that we think was improper, but as there was other sufficient evidence upon that point, it probably did no harm to the appellant, and we should not, perhaps, consider such action of the court sufficient to reverse the judgment, if the record was otherwise free from error.'' It is shown by the language used that the court did not consider this question, looking upon it as unimportant to the determination of the issue involved. It is equivocal to say the least.

In *Vogt v. Cope*, 66 Cal. 31, 4 Pac. 915, cited by appellant in support of its contention, we find the following head lines to the syllabus: ''Evidence—Market Value—Newspaper Reports.—The published reports of sales of a stock exchange are not competent evidence of market value without the proof as to the source from which the information therein was obtained, or whether the quotations of prices were derived from actual sales or otherwise.'' Mr. Justice Ross, speaking for the court, says: ''There was nothing to show, or tending to show, how or in what manner 'the reports of sales' were made up; where the information they contained was obtained; or whether the quotations of prices made were derived from actual sales or otherwise.''

A different condition exists in the case at bar. The witness testified that he had made a number of purchases from the house whose catalogues he consulted; that he had the catalogues of other houses, or had consulted them, and they were all alike—that is, that prices were the same. In other words, from this catalogue he could get the wholesale price in St. Louis, and by adding the cost of carriage he was able to tell the actual cost of the article in Moscow. In *Nelson, Morris & Co. v. Columbian Iron Works etc.*, 76 Md. 354, 25 Atl. 417, 17 L. R. A. 851, we quote from appellant's brief, which is taken from the opinion: ''This was an action to recover a bal-

ance alleged to be due for work and materials. The defendants produced two competent witnesses, who testified that they had been in the hardware business for many years, and had during all of that time dealt in articles of hardware such as those furnished in this case. They were then asked to state what was the fair, reasonable price of certain of these articles, and they replied that they could not do so without consulting the lists, and they said that these lists were schedules of prices fixed by a convention of dealers from year to year. That upon these list prices there was a discount, also fixed by said convention, and that these prices were the established prices in the trade. That there were so many articles, each differing slightly, both in the article itself and in its price, from all the others, that it was impossible for any man to carry the prices of all those articles in his mind. Under these circumstances, the supreme court said that it was proper to permit these witnesses to use the list in question for the purpose of refreshing their memory.'' We are unable to see where the facts in this case differ materially from the one at bar. The witness said in answer to a question on cross-examination, to wit: ''Q. You took what price list? A. Well, the catalogue. This is the same in the various catalogues—Crane, Nelson and all of them. I took N. O. Nelson's of St. Louis.''

It is not shown that the witness was ever requested to bring his catalogue into court for inspection by the court, jury or counsel for appellant, but he does state that the catalogue from which he obtained his information is the one sent out by all wholesale dealers to the retail trade, and clearly falls within the rule laid down in *Nelson, Morris & Co. v. Columbian Iron Works etc.*, above cited.

*O'Brien v. Gallagher*, 26 Misc. Rep. 838, 57 N. Y. Supp. 250: This case involved the question as to whether a letter received by defendant from a dealer in answer to his inquiry respective to market price is admissible in an action for goods sold, on the question of reasonable price or market value. It was held that the letter was not admissible, being hearsay. There is certainly a distinct difference between a

letter and a catalogue giving the price of all articles carried in stock for the retail trade. The merchant might be induced by his customer to "color" prices to assist him in his litigation.

The case of *Norfolk & Western Ry. Co. v. Reeves,* 97 Va. 284, 33 S. E. 606, we have not examined, as it is stated by counsel for appellant that the same rule as announced in *Whalen v. Lynch, supra,* is invoked.

*Dither v. Ferguson Lumber Co.,* 9 Ind. App. 173, 35 N. E. 843, 36 N. E. 765, does not support the contention of appellant. The fourth clause of the syllabus says: "Evidence that other price lists received by the buyer from various people were accurate statements of the market value of lumber was inadmissible."

*Fairley v. Smith,* 87 N. C. 367, 42 Am. Rep. 522, cited by appellant, does not reach the case at bar. The syllabus says: "A witness is incompetent to testify in North Carolina to market value at Boston, Massachusetts, when his knowledge is exclusively derived from market reports in a newspaper published in North Carolina." The opinion in this case by Mr. Justice Smith discusses a number of the cases cited by appellant and the Cliquot wine case. It seems the newspaper report was admitted in evidence (or a witness permitted to testify from it) by the trial court, and the opinion closes by saying: "We therefore think there was error in the admission of the evidence thus obtained by the witness, and without any proof outside the paper of its trustworthiness and recognition as such by business men dealing in cotton."

A very interesting discussion of a question almost identical with the one before us will be found in 70 U. S. 114, 18 L. ed. 116, known as the Cliquot Champagne case, cited by respondents. It is by Mr. Justice Swane, and is the unanimous decision of the court. In the opinion it is said: "In *Lush v. Druse,* 4 Wend. 315, the proof upon the trial, in the court below, was as follows: 'A witness proved the value of wheat in Albany in 1822, 1823, 1824 and 1825, derived by him from books of large dealers in wheat, at that place, he knowing nothing of the price, of his own knowledge.' The court said:

'The proof was by a witness who had inquired of merchants dealing in the article, and examined their books. This, uncontradicted, was sufficient.' With this ruling we are satisfied. While courts in the administration of the law of evidence, should be careful not to open the door to falsehood, they should be equally careful not to shut out truth. They should not encumber the law with rules which will involve labor and expense to the parties, and delay the progress of the remedy—itself a serious evil—without giving any additional safeguard to the interests of justice. We think the 'Price Current' is not liable to the objection that it was hearsay. It was prepared and used by the party who furnished it in the ordinary course of his business. It is as little liable to that objection as the entries in the books of the dealer, or his answers to the inquiries of a witness, both of which were admissible upon the authority of the case referred to in Wendell. It was clearly relevant.''

A careful review of the record in this case, together with the authorities cited, convinces us that the judgment should be affirmed, and it is so ordered, with costs to respondents.

Ailshie, J., and Sullivan, J., concur.

ON PETITION FOR REHEARING.

(July 11, 1905.)

AILSHIE, J.—The appellant in a petition for rehearing calls our attention to the fact that in the original opinion the court did not pass directly upon the objection that the evidence given by the witness Sherer as to the value of the various articles to which he testified was not confined to the time the work was being performed and the articles furnished. It is true we did not pass in direct terms upon that question, but the view we took of the matter was that it had not prejudiced the appellant in any respect; and, of course, in affirming the judgment we at least impliedly ruled adversely to the appellant's contention. An examination of the evidence admitted, to which this objection was interposed, shows that the witness, when testifying, gave the prices as they were quoted

at the time, and the trial court repeatedly in his rulings held
that the respondents must carry these prices back to the time
the work was being performed and the articles furnished, and
must fix the prices as they then existed.    After stating the
prices of the various articles, the witness further testified that
such articles were cheaper at the time he was testifying than
they were at the time this work was being performed and these
articles were being furnished, namely, the latter part of the
year 1901 and the early part of the year 1902.    He further
testified that upon an average of all the articles they were at
least five per cent cheaper at the time of the trial than they
were at the time when the appellant was entitled to have the
price fixed.    It is at once apparent from this evidence that
it did not, and could not, prejudice the appellant.    If the
prices as given by witness were fixed at a time when the
articles were really cheaper than they had been at the time
when the prices should, as a matter of law, have been estab-
lished, then the appellant could not suffer from such evi-
dence.    It would rather be to the appellant's advantage.    If
the conditions had been reversed and prices had been higher
at the time the witness was testifying, then it is clear the ap-
pellant would have been prejudiced.

A further examination of this case convinces us that no
sufficient reason exists for granting a rehearing.    The peti-
tion is therefore denied.

Stockslager, C. J., and Sullivan, J., concur.