[No. 7968.]

ATKINSON V. COLORADO TITLE & TRUST COMPANY ET AL.

1. MORTGAGE—*Purchaser of Bonds Not Bound to See To Application of Purchase Money.* The Star and Crescent Creamery Company, and The Star and Crescent Building Company were organized by the same persons, and the same persons were the officers of each corporation. The Building company was organized to assist in the construction of a building for the use of the other company. The officers of the first company had bargained for certain lots, as the site of the building, and the latter company afterwards issued its bonds, which were to be, and were, secured by deed of trust of the building site; and through an agent had sold certain of the bonds, realizing the sum of $4,500. At the instance of the corporate officers the check for this amount was made payable to the Creamery company, was checked out to pay for the building site, and the conveyance therefor was executed to the Building company, which thereupon gave to a trustee a deed of trust for securing the bonds. In a proceeding to enforce mechanic's liens upon the building site the legality of the deed of trust was contested, but it was *held* that the bonds were valid obligations of the Building company, that the purchasers thereof were under no duty to supervise the disposition of what they paid for them to the agent of that company, that their rights were not affected by the temporary diversion of what they had paid, to the treasury of the Creamery company, and that the deed of trust was a valid and subsisting lien upon the mortgaged premises. (535.)

2. MECHANIC'S LIEN—*Who Entitled.* In the same case the Creamery company, before the organization of the Building company, and while it was intending to itself erect the building, had contracted for steel, to be used in its construction. The Building company, after its organization, attempted to carry out the same project, and complete the building, and a quantity of

steel purchased by the Creamery company was delivered and accepted by the contractor for the erection of the building, at the request of both companies. *Held* that though the building was never completed, nor the steel actually used, the one furnishing the steel was entitled to a judgment against the Building company, and to a lien for what it had so furnished. (535, 536.)

3. —— *Mortgage—Priority of Liens.* A mortgage of lands executed and recorded prior to the execution of a contract for the improvement of the lands, and prior to the commencement of work towards such improvement, is superior to a mechanic's lien upon the land, and junior to such lien upon the improvement (Rev. Stat., secs. 4026-4030). (536-538.)

Under Rev. Stat., sec. 4027, labor performed and material furnished for an entire structure gives a lien upon such structure, though it is never completed. The improvement may be sold separately from the lands, and the purchaser may remove it. The phrase "for an entire structure" is intended, not to distinguish between a completed and an uncompleted building, but to distinguish between structures not before existing, and repairs or improvements upon buildings previously constructed.

The improvement consisting of nothing but the foundation and basement walls, not susceptible of removal without destroying their value, it was *held* that inasmuch as the statute does not contemplate the destruction of the value of the improvement, in such case, the property must be sold as a whole, the value of the lands, both with and without the improvement ascertained, that to the extent that the lands, merely, furnished the fund, it should be applied to discharge the mortgage and the cost of foreclosure, and that the residue of the fund should be applied to discharge the mechanic's liens, and the cost of the enforcement thereof, in the order of their priority. (538, 539.)

*Held* further, that under Rev. Stat., sec. 4032, the lien of the party furnishing the steel was of the second class, and superior to that of the principal contractor and other lien claimants. (538.)

*Error to El Paso District Court.* Hon. J. W. SHEAFOR, Judge.

*Statement of the Case:* J. W. Atkinson, Schwingel & McCandlish, and the Trussed Concrete Steel Company, each brought an action against the Star & Crescent Building Company to foreclose mechanics' liens for labor and material furnished towards the construction of a creamery and storage building, the erection of which never proceeded further than making the basement excavation, and putting in reenforced concrete footings, basement walls to grade line, and foundations for machinery. For the purposes of trial these mechanics' lien suits were, by stipulation, consolidated

with an action of The Colorado Title & Trust Company against the Star & Crescent Building Company, brought in the lower court to foreclose a mortgage or deed of trust on lots 14, 15 and 16, block 275 in Addition No. 1, City of Colorado Springs.

The court found the mortgage was a valid, prior and superior lien to any liens of the mechanic lien claimants; that subject to such mortgage lien, Atkinson, and Schwingel & McCandlish each were entitled to liens of equal rank, and that the Steel Company should take nothing. A decree for sale on foreclosure was entered, and application of the proceeds directed in accordance with such findings.

The Star & Crescent Creamery Company, a corporation, of which F. W. Edmonds was president, and his son, R. S. Edmonds, secretary, was engaged in the creamery business at Colorado Springs, and desired to purchase a site and erect thereon a creamery and storage building. For this purpose the Creamery Company took steps in the fall of 1910 towards the construction of such a building by purchasing or negotiating for the lots, and employed Schwingel & McCandlish to prepare plans and specifications. November 18, 1910, the Creamery Company, to prevent delay in the construction, entered into a written contract with the Steel Company to furnish the necessary steel to be used in the building, and incorporated therein a clause to the effect that the contract for steel would be assumed by the successful bidder in his contract for the construction of the building. Subsequently the Edmonds, who were in control of the business, and the prime financial movers and promoters of the project, instead of carrying out the original plan, conceived and executed the idea of financing the project by organizing a building company, separate from the Creamery Company, to acquire the building site from the Creamery Company, and erect thereon a building for its use. The funds necessary to finance such an enterprise were to be raised by selling bonds of the Building Company, secured

by deed of trust or mortgage on the lots, and improvements to be erected thereon. December 5, 1910, pursuant to this plan, the promoters caused to be organized the Star & Crescent Building Company. December 9, 1910, The Creamery Company entered into a contract with the Building Company, agreeing to convey the lots to the latter, in consideration of 45 shares of its preferred capital stock, but the stock was not actually issued until some time in January, 1911. The Building Company then attempted to do what the Creamery Company had planned. The two companies having the same officers, being under one management, and working for the same object, it was some times difficult to draw a line of distinction between them. Bonds to the amount of $20,000.00 were duly authorized and issued by the Building Company, secured by deed of trust or mortgage on the lots, and improvements to be subsequently constructed thereon, and the Colorado Title & Trust Company, defendant in error, was made trustee for the bond holders. The Building Company employed one Pease to sell the bonds on commission, and December 30, 1910, he sold and delivered five of them to his clients, from which, after deducting a discount and his commission, $4,500.00 was realized, and in accounting for this money to the president and secretary of the Building Company, he gave them his personal check made in the first instance to the Building Company, but at their request changed, by writing over the word "Building" the word "Creamery," thus making it payable to the Creamery instead of the Building Company. These officers at the time explained to him that this was done as a matter of convenience; that the Building Company had not yet opened a bank account, and all its accounts were kept with those of the Creamery Company. This check was deposited at once by the secretary, to the credit of the Creamery Company, whose officers immediately checked out the fund in payment for the lots; the deed, at the request of the Creamery Company, being executed to the Building Company, which was

credited by the Creamery Company with $4,500.00, and the deed, and trust deed, were placed upon record. The following day, December 31, 1910, Atkinson, plaintiff in error as principal contractor, entered into a contract with the Building Company to erect the building upon the lots, according to the plans and specifications previously prepared for the Creamery Company, by the architects, and a few days afterwards began the excavation. About this time he claims he was informed for the first time that the Creamery Company had already ordered the necessary steel for the building. It seems both companies requested him to use this steel in the construction, which he says he agreed to do as far as he could. While he was proceeding with the excavation, they notified him that a car of steel consigned to the Creamery Company had arrived, and requested him to pay the freight, and take charge of it, which he did, storing the steel on the property and adjacent lots, to be used in the construction of the building. He claims, however, to have done this as a matter of accommodation to the Creamery Company. After completing the cement footings, basement walls and foundations, in which he used some of the steel, he presented to the Building Company a statement, and it not having the money to pay him, he discontinued the work, and afterwards filed a mechanic's lien statement for the amount he claimed to be due him at the time, and no further work has since been performed by anyone towards the construction or completion of the building. The architects filed a lien statement for the unpaid balance due them, and the Steel Company did the same for the steel furnished under its contract with the Creamery Company to be used in the construction of the building.

Atkinson asks to have the case reversed because, as he says:

(a)   The bond holders paid the Building Company no consideration for the bonds.

(b)   The money paid for the bonds was diverted by

Pease from the Building Company, at the direction of its president and secretary, without authority; that the bond holders through Pease as their agent, were charged with knowledge of such facts as he might have obtained upon inquiry.

Messrs. HARRIS & PRICE, for plaintiff in error.

Mr. HORACE G. LUNT, Mr. MICHAEL B. HURLEY, Mr. WILLIAM E. HUTTON, for defendant in error, The Colorado Title and Trust Company.

Mr. R. H. ARNOLD, for defendant in error, Trussed Concrete Steel Company.

GARRIGUES, J. (After stating the facts as above.)

1. The main principle involved, is whether the bonds sold by Pease are binding obligations of the Building Company. It is claimed by the mechanics' lien claimants that they art not, and that the bond holders should recover nothing, because Pease, as their agent, paid the money to a third party without authority; therefore the judgment and decree are erroneous, leaving the mechanics' liens superior liens on the property. The Steel Company contends it is entitled to a personal judgment against both Atkinson and the Building Company, and to a lien superior to the trust deed, and prior to those of the other lien claimants.

Pease was engaged in the business of buying and selling bonds and securities at Colorado Springs, and the Building Company employed him to sell the bonds on a commission. He was at the time also the agent of clients residing in the East for whom he bought and sold securities, and to whom he sold these bonds. The president and secretary of the company were duly authorized to make, execute and deliver the bonds, and they were its lawful obligations. The Building Company continued to carry on the objects, purposes and negotiations undertaken by the Creamery Company, the plan being, before the organization of the Building Company,

to take $4,500.00 out of the treasury of the Creamery Company, and pay for the lots on which to erect the new building. These plans were changed by promoting a Building Company, organized by the same persons to accomplish the same object, both acting through the same agencies, and in many respects it was difficult to distinguish between them. The Creamery Company had already purchased, or agreed to purchase, the lots for $4,500.00, and had them deeded to one Spurgeon, who paid the purchase price, and held the title for the Creamery Company. December 30, 1910, when it became necessary to close up the transaction, and transfer the title of the lots to the Building Company, so that the trust deed to be given to secure the payment of the bonds could be recorded, the Creamery Company had no funds in its treasury; it was $60,000.00 in debt and could not pay Spurgeon, or take over the title. Pease the same day sold five of the bonds, and held the money ready to turn over to the Building Company. The Creamery Company through the duality of its officers with the Building Company, obtained possession of the money from him, and used it in paying for the lots it had sold and agreed to deed to the Building Company. The transaction, though technically speaking not a loan, was treated as such, or rather as money advanced by the Building Company to the Creamery Company. The officers of the Building Company directed Pease in settling for the bonds, to make the check payable to the Creamery Company, and it was at once deposited to the checking account of that company, placed to the credit of the Building Company and immediately the same persons as officers of the Creamery Company gave a check against the fund in payment for the lots, the deed was made direct to the Building Company, recorded, and immediately thereafter the trust deed was placed on record. The Creamery Company went into bankruptcy, and the Building Company filed a claim for this account, which it had allowed as money advanced to the Creamery Company.

2. The bonds were payable to bearer, were negotiable by delivery, were delivered to Pease, and he sold and delivered them to his clients. It matters not what the relations between Pease and the bond buyers were in his transactions with them. In accounting to the Building Company for the bonds, and the fund realized from their sale, he was the agent of the Building Company. The bond buyers paid full value to the person whom the company entrusted with the possession and sale of the bonds, and the purchasers were under no obligation to look to the application of the proceeds. Pease accounted to the president and secretary of the Building Company, and made the checks payable as they directed. Because the officers of the two companies were the same, and manipulated the transaction in such a manner that the money was used in payment for the lots, when it should have been turned into the treasury of the Building Company is no concern of the bond holders. 10 Cyc. 1167-1176; *P. & S. Co. v. Thompson,* 103 Ill. 187; *Martin v. Mfg. Co.,* 122 N. Y. 165, 25 N. E. 303; *Hotchkiss v. National Banks,* 21 Wall. 354, 22 L. Ed. 645; *Philadelphia Co. v. Lewis,* 33 Pa. St. 33, 75 Am. Dec. 574; *Railway Co. v. Sprague,* 103 U. S. 756, 26 L. Ed. 574; *Pittsburg Co. v. Lynde,* 55 O. St. 23, 44 N. E. 596.

The court committed no error in holding that the mortgage was a valid and subsisting lien upon the land and premises in controversy.

3. Was the Steel Company entitled to a judgment against the Building Company for the consignment of steel furnished to be used in the construction of the building under the contract with the Creamery Company, and to a mechanic's lien?

When the Building Company took over the lots and entered upon the construction of the building, it succeeded the Creamery Company in the steel contract, and under the circumstances, the court should have made no distinction between them, but should have treated the steel contract the same as though it had originally been made with the

Building Company.   The court erred in holding that the
Steel Company should take nothing.   It was entitled to a
judgment against the Building Company, and to a mechanic's
lien.

4.   Was the Steel Company entitled to a mechanic's
lien for all the steel actually furnished under the contract,
to be used, although not actually placed in the building?
The steel was furnished to be used in the construction of
this building and because it was not finished, and all the
material used, makes no difference.   The statute gives a
lien to the material man furnishing material to be used in
the construction of a specified building, and we are of the
opinion the Steel Company was entitled to a judgment
against the Building Company, and to a mechanic's lien for
the steel furnished upon contract to be used in the construc-
tion of the building, although it was not finished and the
steel not all actually used. *Rice v. Cassells,* 48 Colo. 73, 108
Pac. 1001; *Salzer Co. v. Lindenmeier,* 54 Colo. 491, 131 Pac.
442; *Small v. Foley,* 8 Colo. App. 435, 147 Pac. 64; *Tabor
Co. v. International Co.,* 19 Colo. App. 108, 75 Pac. 150.

5.   Did the court err in holding that the mortgage was
a prior lien to the mechanics' liens on both the land and im-
provement, and was the mortgage a prior lien upon the land
to the mechanics' liens?

These two questions will be considered together.   The
mortgage was duly made and recorded prior to the signing
of the contract, or the commencement of the work upon the
improvement.   The statute in such a case (Secs. 3-6 Me-
chanics' Lien Act, 1899) makes the mechanic's lien a prior
lien upon the improvement, while an existing mortgage re-
mains a prior lien upon the land.   Text book statements to
the contrary, which only apply in the absence of a statute,
are not controlling.   This improvement was made, and
came into the possession of the Building Company, subject
to the right under this statute to file mechanics' liens, and
the land passed under the provisions of the mortgage when

it was given, subject to the right to file mechanics' liens, which, when filed, the statute made superior liens to the mortgage, on the improvement. The only exception or modification to this rule to which our attention has been directed, is *Joralmon v. McPhee,* 31 Colo. 26, 71 Pac. 419, where we held that to the extent the money advanced under the prior mortgage was actually applied in making the improvement, the mortgage was a first lien on the improvement. So we are of the opinion the court was right in deciding that the mortgage was a first lien on the land; but erred in holding that the mechanics' liens were not prior liens on the improvement.

6. Section 4027 R. S., '08, provides that when the lien is for work done or material furnished "for any entire structure" the lien shall attach to such building, in preference to any prior mortgage upon the land, and any person enforcing such lien may have the building sold under execution, and the purchaser at the sale may remove the improvement. It is argued that inasmuch as nothing was done except to make the excavation and put in the cement basement walls, that the work done and material furnished were not for an entire structure; that is, it was not entire, because it was not completed, therefore, the statute authorizing the sale and removal of the improvement does not apply.

Was this work done and material furnished for an entire structure? The phrase, "for an entire structure," is not used to designate a completed from an uncompleted building; but to distinguish new structures not before existing, from betterments, repairs, improvements, and the like on previously constructed or existing improvements.

*Church v. Smithea,* 4 Colo. App. 175, 35 Pac. 267. The labor in this case was done and the material furnished for an entire structure. Because it was not completed did not change the purpose for which they were furnished. There was a suspension of labor for 30 days, and in such case the statute provides, for the purposes of the mechanic's lien act,

it shall, whether or not actually completed, be regarded as completed.

7.    Under the provisions of the statute (Sec. 8, L. '99) the Steel Company belongs to the class designated as material men, and its claim is made second class, while the other lien claimants are designated as principal contractors, and in ranking order their lien claims are third class; therefore, the Steel Company's lien for material is prior in rank to the liens of the other lien claimants.

8.    The statute provides that any person enforcing a mechanic's lien on an improvement in a case like this, may have the improvement sold under execution and that the purchaser may remove the same.    The improvement here consisted of the basement walls and foundations, and we will take judicial notice they could not be removed and retain any value.    In enforcing the lien on the improvement under these circumstances, the mechanic's lien law does not contemplate a course that will destroy the value of the improvement, and here the only way the improvement can be effectively reached to satisfy the lien against it is to sell the entire property as a whole, and pursue some equitable course with the fund realized from the sale which will afford the greatest protection to the rights of all the parties. Whether the improvement as it exists on the property at the time of sale will increase the fund realized, or add nothing to the value of the property at that time, is a question of fact.    We therefore direct the lower court to enter a proper decree in conformity with the views herein expressed, and order a sale of the property as a whole on foreclosure.    If the fund realized is sufficient to discharge all the liens, and cost of their foreclosure, no further action will be necessary; but, if such a fund is not realized, and in fact the improvement contributes some amount on the sale, then an equitable rule of apportionment should be adopted, by which the amount that the value of the land, clear of the improvement, contributed to the fund, should go towards the discharge of

the mortgage, and the amount that the value of the improvement added to the fund should go towards the discharge of the mechanics' liens.   We think the court in such an event should hear evidence and ascertain the value of the lots at the time of the sale, with the improvement, and clear of the improvement; that is, with and without the improvement, and to the extent that the value of the lots furnished the fund derived from the sale of the property as a whole, such proportion of the fund should be applied in discharging the mortgage and cost of its foreclosure.   The sum remaining, if any, will represent the amount contributed, on the sale, to the fund by the value of the improvement on the property and should be applied in discharging the mechanics' liens and the cost of their foreclosure in the order of their priority.

9.   The evidence regarding the question of a right to a personal judgment in favor of the Steel Company against Atkinson, for the steel furnished under its steel contract with the Creamery Company, was conflicting and we will not interfere with the judgment of the lower court upon this finding.

Reversed and remanded with directions.

*Reversed.*

GABBERT, C. J., and SCOTT, J., concur.