# No. 11,906.

## HOWARD ET AL. *v.* FISHER ET AL.

Decided December 9, 1929. Rehearing denied January 6, 1930.

Messrs. BARKER, LINDSTROM & WEBSTER, Mr. JOHN D. ROGERS, Mr. WAYNE C. WILLIAMS, for plaintiffs in error.

Messrs. BARTELS & BLOOD, Mr. WALTER W. BLOOD, Messrs. PERSHING, NYE, TALLMADGE & BOSWORTH, Mr. ROBERT G. BOSWORTH, Mr. RALPH W. SMITH, Messrs. DOUD & WALKER, Messrs. GRANT, ELLIS, SHAFROTH & TOLL, Mr. C. RUSSELL SHETTERLEY, Mr. JACOB V. SCHAETZEL, Mr. WALTER E. SCHWED, for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

THIS cause is now before us on rehearing. A decision in department was heretofore rendered, and opinion delivered by a former member of this court prior to his retirement. Petitions for rehearing were filed, and on his recommendation, concurred in by the other justices, the rehearing was granted. The cause then went to banc, further briefs were filed, the case was thereafter argued orally and reassigned. The former opinion has not been reported. Our conclusions in the main are not radically different from what they were before, but our further researches and additional reasons for our decision, justify a fuller treatment of the rights of the numerous parties involved. We have therefore withdrawn our former opinion and this decision en banc is substituted.

This is an action to foreclose mechanics' liens on two adjoining apartment buildings and certain lots in Denver, covered by one contract. It was brought by Francis J. Fisher, a mechanic's lien claimant, plaintiff, against defendants Emma Howard, owner of the premises, the Brendel-Brent Construction Company, principal contractor, the Midland Savings and Loan Company, mort-

gagee (hereinafter called the Midland company), and also against numerous defendant lien claimants and others, who were interested or claimed interests in the subject of the action. Katharine Slohm Auslender, one of the plaintiffs in error, was a purchaser pendente lite. She petitioned for leave to intervene; her request was granted, but the order was later rescinded, and all motions filed by her were stricken. The case was tried to the court.

The mortgages held by the Midland Savings and Loan Company, one of the plaintiffs in error, were held to be subordinate to mechanics' liens. Nearly all of the mechanics' lien claims set forth in the complaint of Fisher, and those in the cross complaints of certain defendants, were sustained and decree of foreclosure was entered. The several amounts awarded to each are set out in a table that follows. Plaintiffs in error seek to have the judgment reversed on errors assigned. There is no controversy between mechanics' lien claimants and there are no cross-errors. There is no substantial dispute as to the facts.

Some of the parties in the district court were only nominal. There were twice as many parties there as there are here or need to be here, but the title to the cause on error, as given to us, was badly misleading. We have been compelled to revise it. It does not precisely correspond with the several judgments, but is taken from the acknowledgments of service of sci. fa. No one but ourselves make any complaint, and we consider the error as merely clerical, but necessary to be corrected. The title should and will now read as follows:

Emma Howard, the Midland Savings and Loan Company, a corporation, and Katharine Slohm Auslender, plaintiffs in error, v. Francis J. Fisher, the Denver Lumber Company, a corporation, the George A. Barrows Lime Company, a corporation, George E. Mayer, doing business under the name of the George Mayer Hardware Company, the Inter-Mountain Insulex Company, a cor-

poration, Louis Cook and Harry Weinstein, doing business as Cook-Weinstein Plumbing Company, Goldberg Brothers, William O. Davis, Amy E. Nace, and J. W. Brannan, defendants in error.

Wm. M. Brendle and Robert C. Brent, doing business as the Brendle-Brent Construction Company (hereinafter called Brendle-Brent), principal contractors, were parties below, but their default for failure to answer was entered and they are not made parties to the record in this court. The defendants in error claim liens by virtue of being subcontractors or assignees thereof by direct or mesne assignments.

National Surety Company, hereinafter frequently referred to, is a corporation engaged in the principal business of writing indemnity bonds. It is Brendle-Brent's bondsman on the building contract. The surety company is not a party to the action, although plaintiffs in error sought to have it made such, but the trial court refused.

The money judgments rendered on Fisher's complaint and on the several cross-complaints of defendants named below, are as follows:

| | Judgment Creditors | Judgment Debtors | Amount |
|---|---|---|---|
| 1. | Francis J. Fisher | Howard and Brendle-Brent ... | $13,758.74 |
| 1a. | Francis J. Fisher on 12th to 16th causes of action | Brendle-Brent ... | 7,887.17 |
| 2. | Denver Lumber Co. | Howard and Brendle-Brent ... | 39.58 |
| 3. | Geo. A. Barrows, C. T. Barrows and G. E. Threewit, substituted for the Geo. A. Barrows Lime Company | Howard and Brendle-Brent ... | 596.31 |
| 4. | George E. Mayer | Howard and Brendle-Brent ... | 106.70 |
| 5. | Inter-Mountain Insulex Company | Howard and Brendle-Brent ... | 725.38 |

| | | |
|---|---|---|
| 6. | E. Burkhardt & Sons Steel & Iron Works Co. | Howard and Brendle-Brent ...$ 1,341.47 |
| 7. | Louis Cook and Harry Weinstein, doing business as Cook-Weinstein Plumbing Company | Brendle-Brent ... 16,862.60 |
| 8. | Goldberg Brothers | Howard and Brendle-Brent ... 132.60 |
| 9. | William O. Davis | Howard and Brendle-Brent ... 3,628.55 |
| 10. | Amy E. Nace | Howard and Brendle-Brent ... 418.54 |

$45,497.64

The above items represent labor performed on, or materials used in, the buildings. Principal and accumulated interest to the date of the decree was allowed. The judgment for $45,497.64 was held to be a first lien on the lots and buildings, and the decree directs foreclosure sale thereof to satisfy the judgment, proceeds of the sale to be prorated.

For convenient reference only, we shall divide the above judgment into classes A and B. Class B consists of the following: No. 1a, Francis J. Fisher, on 12th to 16th causes of action, $7,887.17, and No. 7, Cook-Weinstein, $16,862.60. Total $24,749.77. All others, the total of which is $20,747.87, comprise class A. There is no serious dispute about the class A judgments.

The above allowance of $7,887.17 to Fisher grew out of certain original liens of subcontractors, supposedly assigned. Exclusive of interest, they are as follows: Morris R. Price, $1,603.16; Henry Afman, $3,400; Central Electric Supply Company, $754; Federal Lumber Company, on two counts, $1,294.60.

The judgment in favor of Cook-Weinstein, also subcontractors, was recovered on their separate cross-com-

plaint, wherein they claim in their own right, but the proof disclosed that their claim was prosecuted for the benefit of National Surety Company, as were also the Fisher claims to the extent of $7,887.17. Fisher's complaint, as amended at the trial, alleges mesne assignments, without mentioning the surety company.

Preliminary to the chronology that follows, and for a better understanding of class B claims, we add that they came about under the following circumstances: Brendle-Brent, principal contractors, abandoned the work before it was finished; they assigned their building contract to the surety company. The latter carried on the work to partial completion, and notified Cook-Weinstein and some of the other subcontractors that it (the surety company) would pay their claims. The surety company in fact did pay all subcontractors represented in class B, but now seeks to foreclose mechanics' liens under the Fisher complaint and Cook-Weinstein cross-complaint, and thereby recover the money thus paid.

No personal judgment was obtained against Emma Howard, the owner, on the claims in class B, but as stated above, the decree of the trial court makes the entire judgment for $45,497.64 a lien on the property. Attorneys for Fisher and Cook-Weinstein in open court voluntarily waived personal judgment against Mrs. Howard as to the claims in class B.

Further facts leading up to the rendition of the foregoing judgment and decree are as follows:

January 20, 1925, defendant Emma Howard was the owner of unimproved lots 30, 31, 32, 33 and 34, block 90, J. W. Smith's Addition to Denver. On that date, Mrs. Howard entered into a written contract with Brendle-Brent, as contractors, for the construction of two adjoining apartment buildings on above lots, each building to be a duplicate of the other, for the agreed sum of $71,710 for the two buildings. Among other things, the contractors agreed to provide all the material and to perform all work and, on the completion of the buildings, to de-

liver same free from all liens of every kind and nature. The building contract was not recorded in the office of the county clerk and recorder.

January 22, 1925, before construction work began, Mrs. Howard borrowed from the Colorado Mortgage Company the sum of $45,000, for the purpose of financing and paying for the erection of the buildings. She gave her promissory note, due in 120 days from the date thereof, for that amount to such company and on the same day executed a deed of trust in the usual form to secure payment. January 24, 1925, the mortgage or trust deed was recorded. The respective attorneys for Mrs. Howard and the Midland company state in their brief that this trust deed "expressly provided that the loan was made for the express purpose of erecting these apartment buildings," but this is a mistake, because exhibit 40, a certified copy of the deed of trust, does not contain any such provision. However, it was for such purpose, and $36,000 of the amount went into the building, also $7,049.75 for lots and some money for taxes. (See below under April 17 for release of this mortgage.)

On or prior to February 11, 1925, actual construction began on the apartment houses.

March 13, 1925, Brendle-Brent, as principal, and National Surety Company, as surety, executed an indemnity bond to Emma Howard and Colorado Mortgage Company for the faithful performance of the building contract. The bond provides, among other things, that in the event of Brendle-Brent's default in the performance of the contract, or if they abandon the work, the obligee shall immediately notify the surety and thereafter the surety shall have the right, at its option, to assume and sublet the contract, and to proceed thereunder as if no default or abandonment had occurred, and that upon the exercise of such election, all unpaid moneys under the contract belong to and become payable to the surety.

About March 30, 1925, Brendle-Brent, Emma Howard and the surety company agreed upon certain extras and

additions beyond the original contract price. These extras and additions were to amount to $11,399.

On or about April 7, 1925, while construction work was in progress, Mrs. Howard needed more money to carry it on, and procured a loan of $60,000 from the Midland company, evidenced by two promissory notes of even date therewith, in the principal sum of $30,000 each, payable to the order of the Midland company, secured by two real estate mortgages, one of which covered a portion of the property and the other, another portion thereof. Each of these mortgages contains this provision: "This mortgage is given and executed for the purpose of raising money or funds with which to make erections, improvements or buildings on the above described real estate." In fact, it was used to pay off the previous mortgage to Colorado Mortgage Company, also to make further payments for the lots and other sums for building purposes. April 8, 1925, both of the Midland company mortgages were recorded in the office of the county clerk and recorder of the City and County of Denver.

April 17, 1925, the $45,000 mortgage to Colorado Mortgage Company was released of record.

Shortly prior to May 23, 1925, Brendle-Brent defaulted and abandoned the work. About that time, the Midland company notified the surety company that it had succeeded to all of the rights, title, interest and claims of the Colorado Mortgage Company under the surety bond.

May 23, 1925, the surety company wrote the Midland company that it (the surety company) had been notified that the contractor was in default; the letter directs the Midland company to hold and retain moneys due or to become due the contractor to be used by the surety "in settling and paying any and all liability arising under said bond to labor or material men, or others, and must not be paid to the contractor by you (the Midland company)."

On or about May 23, 1925, the surety company exer-

cised its option to assume and sublet the contract, took over the work, and continued it for a time.

June 17, 1925, Brendle-Brent assigned and transferred to the surety company all of Brendle-Brent's rights, title and interest in the building contract, and all supplies, tools, plans, and equipment and materials upon the work specified in the contract; also all rights in all subcontracts relating thereto, together with the material embraced therein; also all deferred payments, retained percentages and securities. The agreement further recites that "it is hereby expressly agreed," between Brendle-Brent and the surety, that there has been a breach by Brendle-Brent in the performance of their contract, for which the surety company has become liable to Emma Howard under the terms of the bond, and that the assignment is taken to secure the surety company against loss and damage.

On June 19, 1925, the surety company wrote the following letter to Cook-Weinstein:

"Denver, Colorado, June 19, 1925.
"Re: Bond No. 3566973, Claim 31566
"Brendle-Brent Construction Company (Howard job)
"Cook-Weinstein Plumbing Company
"1953 Welton Street
"Denver, Colorado
"Gentlemen:

"Referring to your contract of February 20, 1925, with the Brendle-Brent Construction Company for the installation of plumbing in the Howard Apartment buildings.

"Please be advised that National Surety Company has assumed the contract of Brendle-Brent Construction Company entered into with you on the date mentioned above.

"In order to facilitate the completion of said contract, National Surety Company hereby agrees that it will pay to you the entire amount called for by said contract on or before the tenth day of July, 1925, provided you finish said contract by July 1, 1925, and exhibit to said National

Surety Company proper releases for material, etc., incurred in said job.

"National Surety Company,
"By Ralph W. Smith,
"Vice President.
"Accepted: Cook-Weinstein,
"By Harry Weinstein."

In conformance with above, the surety company paid Cook-Weinstein in full, and also paid the subcontractors under Fisher's 12th to 16th causes of action. The surety took mesne assignments from the several subcontractors in class B. They were made out in favor of the surety's vice president, but it is admitted that he was acting for his company, and that all disbursements of money made by him were repaid to him by its New York office.

On or about June 27, 1925, the surety denied liability on the bond and ceased work on the job. Mrs. Howard, or someone on her behalf, carried it on to completion. Fisher's and Cook-Weinstein's attorneys claim that the surety company is not liable on the bond because of fraud of some nature, but they did not plead fraud, nor prove it. It was not in issue. We refer to the pleadings later.

In general, the principal questions of law involved are: Relative priorities of mortgages and mechanics' liens; the validity of certain mechanics' lien claims as affected by the triple character or identity of the surety as lien claimant, bondsman, and assignee of defaulting principal contractor; questions of pleading; evidence of prior action pending; right of purchaser pendente lite to intervene; and appellate practice and procedure.

1. The Midland company claims that its mortgages are superior in rank to mechanics' liens. We must disagree; we have examined the argument in the light of section 6447, C. L. 1921, which reads in part: "All liens, established by virtue of this act shall relate back to the time of the commencement of work under the contract between the owner and the first contractor, or, if said contract be not in writing, then such liens shall relate

back to and take effect as of the time of the commencement of the work upon the structure or improvement, and shall have priority over any and every lien or encumbrance subsequently intervening, or which may have been created prior thereto, but which was not then recorded, and of which, the lienor, under this act, did not have actual notice. Nothing herein contained, however, shall be construed as impairing any valid encumbrance upon any such land, duly made and recorded prior to the signing of such contract, or the commencement of work upon such improvement or structure. * * *''

Work commenced on the structures on or prior to February 11, 1925. This fixed the date of mechanics' liens. The Midland company mortgages were recorded on April 8, 1925. The latter were ''subsequently intervening'' encumbrances within the meaning of the above quoted section. The statute is clearly expressed. It makes the subsequent mortgages junior to valid mechanics' liens which had attached to the lots and buildings prior thereto. *State Bank of Chicago v. Plummer,* 54 Colo. 144, 155, 129 Pac. 819. We affirm the judgment in this respect, but make it plain that by the expression ''valid mechanics' liens,'' we mean those represented in the above class A, not those in class B, for the reason that the latter are invalid claims; and so, not liens at all, as we shall presently show.

2. Counsel for the mortgagee points out a particular instance where W. O. Davis, one of the above named lienors, had actual notice that the Midland company was furnishing funds for construction work on the buildings. But the Midland company furnished such funds after the mechanics' liens attached. It had actual notice thereof, as well as constructive notice by commencement of work on the structures. It was charged with notice that money paid out under its subsequently recorded mortgages would be subject to valid mechanics' liens, in the absence of a different agreement with the lienor or lienors, of which there was none.

3. If we should hold that a mortgage recorded after mechanics' liens have attached is superior to the latter, it would defeat the primary purpose of the act. The catastrophe that would result to the industrial life of a community is at once apparent. If an army of laborers or material men should besiege the county clerk's office every morning on their way to work, to see whether some junior mortgage had cut out their rights, it would avail them nothing, for they would be powerless to help themselves. They would be coerced into submission if the construction sought for be adopted. And even when it is said that the subsequent mortgagee acted in good faith, as the Midland company unquestionably did in furnishing money, nevertheless the statute does not delegate to a junior mortgagee or other junior encumbrancer, the right or power to constitute itself a senior lienor at its own will or pleasure.

4. Counsel for the Midland company relies on *Joralmon v. McPhee,* 31 Colo. 26, 71 Pac. 419. He argues that when the Midland company paid off the Colorado Mortgage Company $45,000 note, the proceeds of which had gone into the buildings, and when Midland paid the Colorado Mortgage Company, it resulted in subrogation in favor of the Midland company, so as to make that amount a prior lien, as in the Joralmon case, supra.

That case is not parallel to this. We are satisfied with the Joralmon decision under its own facts, but we agree with the ruling of the trial court that it cannot be extended beyond its meaning to fit the different facts of this controversy. *Joralmon v. McPhee, supra,* involved the question of priority of liens on improvements, between mechanics' liens and deeds of trust recorded *prior* to the commencement of work on the structure. In that case the materialmen had notice when the work commenced, that the loans secured by the trust deeds were made for construction purposes, but in this cause the work commenced on or prior to February 11, and the Midland mortgages were not recorded until the following April,

when construction work had been in progress for two months. Notice of a mortgage recorded before mechanics' liens have attached, and notice thereafter, are essentially different. The Joralmon case, cited in *Atkinson v. Colo. Title & Trust Co.*, 59 Colo. 528, 537, 151 Pac. 457, is not in point. The earlier trust deed to the Colorado Mortgage Company was paid, canceled and discharged of record. It was not even pleaded. The Midland company pleaded its own mortgages only, and irrespective of pleadings, it is evident that the mistaken idea of subrogation was wholly an afterthought; it cannot be sustained.

For other cases bearing out our conclusions as to the seniority of mechanics' liens over subsequent mortgages, see *Easton v. Brown*, 170 Mass. 311, 49 N. E. 433; *Batchelder v. Hutchinson*, 161 Mass. 462, 37 N. E. 452; *Chicago Lumber Co. v. Anderson*, 51 Neb. 159, 70 N. W. 919; *Cook v. Moore*, 152 Ark. 590, 239 S. W. 750.

5. It does not follow that because the mortgagee's rights are junior to valid mechanics' liens, it is therefore out of court. It is vitally interested in scrutinizing and objecting to invalid claims or liens, the allowance of which may tend to reduce the value of its own security, or even perhaps destroy it. The Midland company was a claimant of record, "whose title or interests are to be charged with or affected by such lien," as defined in section 6452, C. L. 1921. As such, it was a necessary party. *Hawkins v. Grisham*, 69 Colo. 156, 170 Pac. 187. The Midland company was rightfully made a party defendant, but its defensive allegations against the surety company claims in class B were disregarded in the decree, which was error. It would be an idle ceremony to make a junior mortgagee a party and give it no voice in the proceedings. It was interested in the preservation of the rem.

6. We do not overlook the fact that the Midland company's pleadings and proof may have largely contributed to the eradication of unlawful claims against the

property, with resulting benefits not only to itself, but also to the owner, Mrs. Howard, and her grantee, Mrs. Auslender. The assistance of the Midland company, mortgagee, also undoubtedly enhanced the value of lawful mechanics' liens, by eliminating unlawful lien claims, set forth in class B, with which items the valid claims would have been otherwise compelled to prorate. Nevertheless, these inevitable indirect benefits to others do not detract from the Midland's statutory right to be heard; it only accentuates the wisdom of its objections. And independently of statute, the books are filled with analogous cases, like actions by mortgagees to prevent waste, where owners may have been indifferent. Also actions, for instance, by junior water appropriators on natural streams, against senior appropriators, or those claiming to be such, to prevent unlawful or excessive use of the "fund" of water in the stream. Illustrations might be multiplied, but it is unnecessary.

We remark in conclusion on this point, that there is no contest here between mechanics' lien claimants as to the relative rank of their own liens, and the objections of the owner and mortgagee are directed against the class B claims of the National Surety Company in particular.

7. Little need be said as to the claims in class A. They have neither been successfully attacked, nor even seriously challenged. That portion of the judgment and decree which declares them to be a first lien on the lots and buildings, and the order of foreclosure as to all liens in class A, will be affirmed, but only as to such liens. It would be unjust to compel such lienors to wait any longer for their money, long past due. Further proceedings in this cause, when it shall have been remanded, cannot in any manner affect their established rights. Mechanics' liens as against the property itself will be no more and no less than those represented in class A, amounting to $20,747.87, with interest thereon from the date of judgment. The foreclosure as to such claims only will therefore proceed without further delay.

■ 8. Concerning the Fisher and Cook-Weinstein claims, indicated by class B, known as National Surety Company claims, amounting in the aggregate to the sum of $24,749.77: they must all be disallowed. When the surety company took over the unfinished construction work on its abandonment by the principal contractors, Brendle-Brent, and procured an assignment to the surety company of the building contract, and then proceeded with the work, the surety company became a principal contractor. *Mazzera v. Ramsey*, 72 Cal. App. 601, 238 Pac. 101, 104; *Robinson v. Hagenkamp*, 52 Minn. 101, 53 N. W. 813; *Spears v. Lawrence*, 10 Wash. 368, 38 Pac. 1049; *Watterson v. Owens River Canal Co.*, 25 Cal. App. 247, 143 Pac. 90; *Ausplund v. Aetna Indemnity Co.*, 47 Ore. 10, 81 Pac. 577.

Language in *Empire State Surety Co. v. Lindenmeier*, 54 Colo. 497, 509, 131 Pac. 437, is apropos: "It was as much the obligation of the contractors and their surety under this agreement [construction contract] and bond, that the materials should be paid for as that they should be furnished. In fact the value of these materials was clearly included within the consideration named in the contract, the performance of which the bond was given to secure." It was there held that the surety company was liable for liens. It is difficult to see how it could be otherwise, for one of the purposes of the bond was to afford that protection; i. e., to deliver the building free of all liens. We have held sureties to be so liable before. *Ripley Building Co. v. Coors*, 37 Colo. 78, 85, 84 Pac. 817; *Covey v. Schiesswohl*, 50 Colo. 68, 114 Pac. 292. See also *Hughes v. Gibson*, 15 Colo. App. 318, 62 Pac. 1037; *Stoddard v. Hibbler*, 156 Mich. 335, 120 N. W. 787.

■ It requires no computation to establish the fact that if a surety company pays a lien, takes an assignment to itself, and procures a foreclosure for its own benefit, the circumlocution does not get anywhere. The surety has thereby merely sought to nourish a lien that it covenanted to destroy. It cannot be allowed. We must hold

that payments by the surety company were in performance of its agreement as surety or as principal contractor; in either of such events, the result is the same. The surety is entitled to allowance to the extent of such payments, for such partial performance of its contract, but it cannot be reimbursed for doing that which it was obligated to do thereunder.

The surety company became subrogated to the rights of Brendle-Brent, and subject to its liabilities. *Ausplund v. Aetna Indemnity Co., supra.* For other authorities holding that the surety company cannot maintain a mechanics' lien claim under similar circumstances, see 9 C. J. p. 857; *Schade v. Muller,* 75 Ore. 225, 146 Pac. 144; *Todd v. Fransvog,* 44 Wash. 520, 87 Pac. 831; *Rounds & Porter Lumber Co. v. Thompson,* (Okla.), 153 Pac. 648; *Miller v. Taggart,* 36 Ind. App. 595, 76 N. E. 321.

9. Reference to the statement of facts, under date of March 13, will show that in case of default by the principal contractor, the surety had the right and option to assume and sublet the contract and proceed as if no default had occurred. This was a valid agreement. The surety might do that, or pay damages resulting from the principals' default, but it did not lessen the surety's obligation. *American Bonding Company v. Regents of University,* 11 Ida. 163, 81 Pac. 604. Its liability could not be terminated by giving notice. 32 Cyc. p. 86; *Ripley Building Co. v. Coors,* 37 Colo. 78, 83, 84 Pac. 817.

10. The attorneys for Fisher and Cook-Weinstein, in advocacy of the surety company claims, argue that the surety bond was fraudulently obtained. We have no means of knowing whether this is true or not, as it is neither pleaded nor proven, but when the surety procured an assignment of the building contract and took over the work of construction, it thereby recognized the validity of the bond, and cannot be heard to assert its invalidity. *Mazzera v. Ramsey, supra.*

11. The same counsel argue also that the

surety did not discover the supposed fraud until after they had taken over Brendle-Brent's abandoned work. We must decline to speculate on the effect of such defense, especially in its bearing on the rights of those not parties to Mrs. Howard's supposed fraud, when the record is destitute of either plea or proof thereof. It is wholly outside the issues. It is too late now to present such plea here. If there was fraud in the procurement of the bond, so as to lift the ban against the surety in its purpose to recover its expenditures, the fraud was waived by failure to plead and prove it. *Gertner v. Limon National Bank,* 82 Colo. 13, 39, 257 Pac. 247, and cases there cited. See also, *Dowdey v. Maxwell,* 73 Colo. 268, 270, 215 Pac. 146.

12. Throughout this opinion we have spoken of various acts of the surety company. A stipulation of facts shows that Ralph W. Smith was its vice president during the period involved, and that in taking assignments of mechanics' liens or claims he was acting for the surety. He was in full charge and control of its local business. The assignment of the Brendle-Brent contract was to the surety in the latter's own name, but whether any of the assignments referred to were to the vice president or surety, we treat the surety as assignee of all thereof. In other words, for all purposes here, as stated by the trial court, Mr. Smith was simply the National Surety Company.

13. The learned trial judge, after hearing the evidence, and before entry of final decree, said: "It would be grossly inequitable, and indeed it is impossible, for the surety company to enforce these assigned claims ogainst this property." With this, we are in full accord. We find no retraction of this statement, but after it was made, counsel for Fisher and Cook-Weinstein moved for a new trial. No new trial was granted and it was unnecessary, but, on further reflection, the court allowed all of the surety company claims, amounting to $24,749.77, notwithstanding the above statement. We must reverse

this part of the decree, and direct the disallowance of all such claims. We think the honorable trial court should have adhered to its first impressions.

14. It is apparent that the ground on which the trial court allowed the surety's claims was that the pleadings of plaintiffs in error did not justify the consideration of the legal effect of the surety's inconsistent triple status as assignee of mechanics' lien claims, bondsman, and principal contractor, after Brendle-Brent abandoned their work and renounced their contractual obligations. It appears to have been considered that there was a duty on the part of plaintiffs in error to plead such matters, in which they failed, and that if they had pleaded them, it would have opened the way for Fisher and Cook-Weinstein to have pleaded Mrs. Howard's supposed fraud. By such plea, followed by proof, it is said in effect, by counsel for Fisher et al., that they could have thereby purged the surety's claims from taint, if there was any such, and so have put them on a parity with valid liens. We have held above, that Fisher et al. were derelict in failing to allege fraud, if there was any. We must now consider the pleadings to determine if there was any omission on the part of plaintiffs in error that caused Fisher et al. to thus err. We think there was not, and that the oversight, if any, was their own.

15. The Fisher and Cook-Weinstein pleadings must be considered separately, as they are essentially different. Fisher's complaint as to the 12th to 16th causes of action in dispute, claimed as assignee of valid mechanics' liens. At the trial, he was allowed to amend to show mesne assignments. The mesne assignor was the surety company, though not expressly named. The answer of the Midland company to the Fisher complaint, alleged, among other things, as a special defense, the execution of the surety bond, and the default of Brendle-Brent; that the surety took possession of the real estate and continued the construction work until June 27, when it refused to further comply with its contract as surety;

that Fisher is not the owner of the lien, not the real party in interest, and that he is prosecuting it on behalf of the surety company which has paid the alleged lien in performance of its contract as surety, which has taken an assignment from Fisher, and that he has no right, title or interest therein or thereon. This was pleaded and proven as to all of the 12th to 16th causes of action.

To the above affirmative allegations, all Fisher filed was a general denial in these words: "That he denies each and every allegation of new matter set up in said answer." This raised no issue of fraud in the procurement of the bond, but it was the place to have raised it, if it could have been raised at all.

16. The facts pleaded by the Midland company, amply sustained by the evidence, constituted estoppel in pais, which to be available, should have been, and were, specially pleaded. See *De Votie v. McGerr,* 15 Colo. 467, 474, 24 Pac. 923; *Gaynor and Standley v. Clements,* 16 Colo. 209, 26 Pac. 324; *Prewitt v. Lambert,* 19 Colo. 7, 34 Pac. 684; *Seeleman v. Hoagland,* 19 Colo. 231, 34 Pac. 995; *Davidson v. Jennings,* 27 Colo. 187, 200, 60 Pac. 354; *Divine v. George,* 63 Colo. 341, 345, 166 Pac. 242; *Watkins Medical Co. v. Johnson,* 70 Colo. 320, 201 Pac. 47; *Gillett v. Moore,* 74 Colo. 484, 496, 223 Pac. 21.

17. It is not necessary that the facts which constitute the estoppel be pleaded as such. It is sufficient if they appear in the pleadings. *Yellow Jacket Irr. Dist. v. Pleasant Valley Ranch Co.,* 78 Colo. 543, 243 Pac. 635; *Field v. Kincaid,* 67 Colo. 20, 184 Pac. 832; *Gillett v. Moore,* 74 Colo. 484, 496, 223 Pac. 21.

18. It is true that Mrs. Howard's answer to Fisher's complaint contained no such special defense as that above cited, from the answer of the Midland company, but the efficacy of the latter's answer in challenging invalid liens against the property, has been explained above, in the sixth paragraph of this opinion. We are not disturbed by the fact that the Midland company was interested only in the preservation of the rem, and that

Mrs. Howard defended against the spoliation of the title as well as against a personal judgment, for, as we have said, counsel for Fisher and Cook-Weinstein waived personal judgment, if they had anything to waive. A personal judgment was not requisite to a decree of foreclosure (section 6454, C. L. 1921), but the absence of this element contributes to the common interest of Mrs. Howard and the Midland company, which they mutually had in their resistance to unlawful lien claims against the property. And even if Mrs. Howard had wholly defaulted, or failed in any respect to answer, her default would not have been the Midland's default.

19. If it be said that the surety bond was neither for the use nor benefit of the mortgagee, so as to give the latter a right to affirmative relief and judgment against the surety for breach of contract to keep the property free from liens (which we have not yet decided), it is equally certain that the bond was not for misuse, and it could not be detrimental to the mortgagee in its defense against invalid claims. If it be argued that there was no privity of contract between surety and mortgagee, nevertheless, it does not detract from the surety's obligation, as voluntary principal contractor, to keep the property clear from all liens, when it put on the cast off shoes of Brendle-Brent. This was true, whether the purpose of the surety company was to make money, or to save it. The Midland company, mortgagee, did not need the surety's consent to object to invalid liens. Its authority therefor is to be found in the Mechanics' Lien Act itself, and the reasons above discussed.

20. In the matter of pleading, Cook-Weinstein's cross-complaint is not difficult of analysis. It declares in quantum meruit for labor, and quantum valebant for materials, all of the reasonable value of $15,035. They sued in their own right as unpaid subcontractors, and not as assignees. Their cross-complaint, in answer to plaintiff Fisher, makes no mention of the surety company. 'Their pleading, in negative pregnant form, says,

inter alia, "that the said *Emma Howard* or *H. H. Howard* and *Brendle-Brent Construction Company,* has paid *no part* of the said sum of $15,035." This is followed with an averment that this amount, with interest, is due and owing *Cook-Weinstein,* and they got judgment therefor, but their cash book and ledger show that they have received *all* of their money from the surety company. It was a simulated plea, exposed by the evidence at the trial, and whether intended to mislead or not, the allegation could have but one meaning, that Cook-Weinstein were unpaid subcontractors. It was unfortunate.

To the above, Mrs. Howard and the Midland company filed a general denial, in connection with other admissions and denials as to other matters. And now, when payment has been proven, Cook-Weinstein seek to depart from their cross-complaint, and to change their theory of nonpayment of a just debt, to that of assignment, but they cannot repudiate their own pleadings. Such departure is not allowable.

21. It may be readily conceded that if Cook-Weinstein or any other bona fide lienor had been possessed of a good cause of action as assignees, pleaded as such, they would have had a right to recover (§ 6458, C. L. 1921), just as many other rightful lienors did. It may also be granted that, if there had been a valid lien, the assignee would have been the real party in interest, as required by section 3 of the 1921 Code. If it were otherwise, the statutory right to assign would be gone; but it is fundamental that the assignee took no greater right than the assignor had to convey. The assignee's rights and remedies are those of the assignor. § 6458, C. L. 1921. And valid existing defenses may be interposed. § 4, 1921 Code.

22. Continuing on the subject of the Cook-Weinstein matter, on whom was the burden of pleading and proving a valid assignment, if there had been one? Certainly on those who asserted the affirmative of the proposition, namely, Cook-Weinstein. See *Gertner v.*

*Limon National Bank, supra,* at page 31. Also *Hughes v. Brewer,* 7 Colo. 583, 585, 4 Pac. 1115. It is elementary that allegata et probata must agree, or else they fail. While recognizing the possibility of valid distinctions that might justify a cautious application of this rule in all cases, there are no such distinctions here. Cook-Weinstein's pleadings and proof were at variance with each other; they fought, and their proof discredited their pleadings. They sued as unpaid subcontractors, and claimed later as collectors for the surety company. Their counsel say that the court gave plaintiffs in error a chance to amend, which they refused. But why should *they* amend? Their pleadings were sound. It has been written, "They that are whole have no need of a physician, but they that are sick." The issue of payment having been proven, the Cook-Weinstein claim should have been dismissed. It cannot be seriously supposed that plaintiffs in error should have been punished for their failure to aid Cook-Weinstein's pleadings for them, nor for declining to answer their unauthorized and unpleaded attempted departures, that is, issues not tendered. It was neither time nor place to demand or require more pleadings, particularly from those not at fault. It called for judgment of dismissal of the surety company claims, and it will be so ordered. We are confident that if this phase of such pleadings had impressed the trial court, the result would have been different. We may add that Mrs. Howard and the Midland company, apparently under pressure of the views of the honorable trial court, *did* tender their supplemental answers at the close of the trial, but the tender was refused, presumably because they did not come sooner.

23. A large part of our work in this case has been devoted to a patient effort to disentangle a labyrinth of crossed wires, that seem to have short circuited logical conclusions. For instance, on the question of "surprise," counsel for Fisher quote from the answer of the Midland company to the Fisher complaint, wherein

Midland dwells at length on the surety's connection with the affair, above referred to. From this, counsel conclude that because the Midland knew, therefore Mrs. Howard knew. Non sequitur. Their pleadings were separate and they were represented by different counsel. Furthermore, lack of surprise at the facts does not indicate absence of surprise at deviations from accepted rules of trial procedure, or at attempted departures from the pleadings. We can well agree with the observations made by the honorable trial court that the interest of the surety in some of the claims, at least, developed at the trial. Their unusual form and method of presentation must not be allowed to militate in favor of those who were responsible for them.

24. Fisher's attorneys seem to have also overlooked the backfire or real significance contained in their quotation from the Midland answer, which was filed on April 1. Fisher's replication thereto was filed in the following May, and the case came on for trial in the ensuing October, on the 27th day of that month. Concerning his argument that estoppel in pais was not pleaded, to thus give him an opportunity to reply with a charge of fraud in the execution of the bond, he is confronted with this verified answer, pleading estoppel, filed nearly seven months before the trial. Also with the fact that his sole reply to it was a general denial. His attorneys directed our particular attention to his terse reply, when they presented it by way of supplemental transcript, filed with our permission.

25. As to class A claims: Fisher and Cook-Weinstein, as proponents of mechanics' lien claims, in that capacity might have interposed valid objections, if there had been any, to the allowance of class A liens. They did not do so, at least in this court, by assignment of errors or otherwise. They are therefore estopped to hereafter question the validity of such claims. Likewise, they could have done so on behalf of their assignor or principal, the surety, for whose benefit they prosecuted

the latter's supposed claims. The assignment gave them that right, and imposed on them that duty while all claims were in process of adjudication, if claims without merit were offered, or else not to object at all. The surety, having elected to come into court through its agents or assignees, Fisher and Cook-Weinstein, acquired no greater rights thereby than if it had seen fit to sue in its own name.

■ The statute contemplates a speedy determination of claims, to the end that mechanics' lienors will not have to wait indefinitely for their money, or for experiments in legal procedure. Unfortunately, this beneficent purpose has not been carried out in this instance, due largely, if not altogether, to the unwarranted assertion of invalid claims. It will not be permissible in any future proceedings, for anyone to question either the validity of class A liens, or the invalidity of lien claims in class B. Foreclosure of class A liens will not be postponed. Further delay would be a denial of justice.

■ 26. Mrs. Howard and the Midland company assign error because the court permitted the files and pleadings in cause No. 91,250, Emma Howard, plaintiff, v. National Surety Co. et al., a prior action pending in the district court of the City and County of Denver, to be received in evidence over their objections. The assignment of error is well taken. The unwarranted purpose of counsel for Fisher and Cook-Weinstein in offering such files and pleadings, was to show that in the former action the surety company had alleged fraud in the procurement of the bond, but its pleadings there did not prove that there was fraud, or that there was not. The exhibits were also inadmissible for the reason that such supposed fraud was not germane to the issues in this case. Furthermore, Fisher brought this suit, and Cook-Weinstein followed it with their cross-complaint. Each of these defendants in error prosecuted claims for alleged liens in large amounts, and they are not in a posi-

tion to prevent a full and final determination of the only issues properly raised here.

Counsel for certain plaintiffs in error expressed their willingness to have the above cause, No. 91,250, consolidated with the present action for trial, but the above defendants in error objected. No error is assigned in this respect, so the point need not be considered.

27. Our rule 54 reads: "On reversing a judgment, the court may order a retrial of specified questions of fact, and direct that specific questions of fact stand as established when it appears that neither party to the action will be prejudiced by such order." We have had this in mind in our examinations here. Although the existence and validity of class A liens has been fully adjudicated and conclusively settled, the question of the liability of the surety company therefor, or to whom liable, if to any one, has not been tried. As the case now stands, this is the only question for future determination. To decide it, it will be necessary to make the surety company a party defendant. The trial court is directed to do this, which reverses its ruling in this respect. The applications in that behalf should have been granted under section 6456, C. L. 1921, which reads, in part: "Principal contractors and all other persons personally liable for the debt for which the lien is claimed shall be made parties to actions to enforce liens under this act, * * *" In quoting this section, we shall neither prejudge the case as to undetermined questions of fact, nor assume that the surety is or is not liable for class A liens, but its responsibility therefor has been asserted, and must be tried. Mechanics' lienors have not made such claim; they have relied on the foreclosure of the property to satisfy their liens, but others interested in the preservation of the property have made the claim, and have not been heard except to have their applications dismissed.

28. Concerning the application of Mrs. Auslender, purchaser pendente lite, to intervene: The law applicable, as we view it, is aptly stated in 13 A. & E.

Ency. Law, p. 900, Par. XII, in these words: "Purchasers pendente lite act at their peril, and are not necessary parties to the suit. The party from whom he purchased continues as the representative of his interests. The court will, however, on proper application, exercise its discretionary power and permit pendente lite purchasers to become parties to the suit when necessary to protect their interests."

For code provisions as to intervention, see sections 22, 23, and 24, of 1921 Code of Civil Procedure. For cases on the subject of purchasers pendente lite, in general sustaining our conclusions, see *Secombe v. Steele,* 20 How. (U. S.) 94, 105; *Tilton v. Cofield,* 93 U. S. 163, 168, 23 L. Ed. 858, 860; *Eyster v. Gaff,* 91 U. S. 521, 23 L. Ed. 403; *Cornell v. Conine Lumber Co.,* 9 Colo. App. 225, 47 Pac. 912; *Norris v. Ile,* 152 Ill. 190, 38 N. E. 762, 43 A. S. R. 233; *Moore v. Jenks,* 173 Ill. 157, 50 N. E. 165; *Smith v. Hodsdon,* 78 Me. 180, 3 Atl. 276; *Steele v. Taylor,* 1 Minn. 274; *Trumbull v. Jefferson County,* 60 Wash. 479, 111 Pac. 569; 40 C. J. p. 405.

In regard to the necessity for including as parties those whose interests are acquired pendente lite, it is well said in *Secombe v. Steele, supra,* "Suits would be interminable, if the rights of parties could be disturbed by mesne conveyances."

Notice of lis pendens was filed, as required by section 6451, C. L. 1921. At that time, Mrs. Auslender had no interest, and would not then have been even a proper party. Her counsel cites section 6452, C. L. 1921, on the subject of who shall be parties in actions to enforce mechanics' liens, but manifestly the statute does not contemplate that a purchaser pendente lite shall or can be made a party in the first instance, although permission to intervene may be granted in the wise exercise of the discretionary power of the court, on seasonable application, in order to protect the interests of such purchaser.

29. Mrs. Auslender would have been a proper party, however, after she acquired her interest, and we

think that it would have been wise in this instance, if the court had allowed her to remain, after she was permitted to come in, rather than to have dismissed her petitions sua sponte. She made her application long before the trial, and was perhaps more insistent than anyone else in her motion to have the surety made a party, which will be accomplished after the case is remanded. She is now the owner of the property involved, and in view of the fact that the cause is to be further tried on specified questions in which she has an interest, the trial court is directed to reinstate her as a party, and to restore her petitions and pleadings. However, she, like all other participants, will be hereafter limited to matters relevant to such specified questions, mentioned in the above paragraph No. 27. The pleadings in that behalf must first be settled. An examination of her assignments of error, and the briefs of her counsel, does not convince us that we should change our opinion as to any matter here reviewed. We have agreed with him in the disallowance of class B claims, and the right to be heard on the question of the liability, if any, of the surety for the burden imposed on the property by class A liens.

30. We regret that the attorneys for Mrs. Howard and the Midland company were not more considerate of the value of our time. The title page in this court, as prepared by them, contained the names of not less than twenty-seven persons, partnerships or corporations as defendants in error. Fifteen of them were not parties here and were not intended to be. Most of them were originally nominal defendants below, against whom defaults had been rendered. We have repeatedly said that a writ of error is in the nature of a new suit. Their interests were severable. The fifteen mentioned were not necessary parties to the record in this court and were not served with sci. fa. We supposed that there was some reason for naming them, and in good conscience felt compelled to look for briefs, pleadings and proof and assignments of errors concerning them. We went to the

transcript also, only to find that they had been named as parties in this court through carelessness. The errors were continued on the covers of the printed abstract and briefs. The same attorneys omitted the name of one real defendant in error, Amy E. Nace, included the name of J. W. Brannan, whose claim had been assigned to another claimant and adjudicated in the name of his assignee, and named as another defendant in error, a party substituted for another in the district court. In this mechanics' lien action, with conflicting claims and others to be examined for possible conflicts, we were obliged to check and compare the twenty-seven or more separately, before we could understand their relative rights. We were forced to determine the equivalent of at least fifteen more cases than were necessary, besides looking out for those misnamed or omitted in the title page. These mistakes will also require a revision of the court indices.

31. The cause will be affirmed in part and reversed in part, in accordance with this opinion. One-half of the costs in this court will be taxed to plaintiffs in error, and one-half to the defendants in error, Francis J. Fisher, and the firm doing business as the Cook-Weinstein Plumbing Company. The case will be remanded for further proceedings not inconsistent herewith.

Mr. Justice Butler not participating.